Ross D. Tillman
John M. Newman
BOONE KARLBERG P.C.
201 West Main, Suite 300
P.O. Box 9199
Missoula, MT 59807-9199
Telephone: (406)543-6646
Facsimile: (406) 549-6804
rtillman@boonekarlberg.com
jnewman@boonekarlberg.com
*Attorneys for Defendant James Yeager*
*d/b/a Jim Yeager Outfitters*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| CHARLES P. McJUNKIN, deceased, by and through his executor and personal representative, RHETT McJUNKIN, and RHETT McJUNKIN, executor and personal representative, on behalf of the heirs of CHARLES P. McJUNKIN,<br><br>          Plaintiffs,<br><br>  v.<br><br>JAMES YEAGER d/b/a JIM YEAGER OUTFITTERS,<br><br>          Defendant. | Cause No. CV-17-12-BLG-SPW-TJC<br><br>**DEFENDANT JAMES YEAGER'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

INTRODUCTION………………………………………………………… 5

UNDISPUTED FACTS… ……………………………………………… 6

LEGAL STANDARD ……………………………………………… 9

    A. Summary Judgment …………………………………………….. 9

    B. Applicable Law………………………………………….…11

ARGUMENT…………………………………………………………..11

    A. Plaintiffs' claims are barred by Montana's Recreation Responsibility
       Act ("the Act"), Montana Code Ann. § 27–1–751, et seq. ………………..11

       1.    The scope of the Act ………………………………………… 11

       2.    Inherent Risk…………………………………………… 15

    B. Plaintiffs' NIED claims fail as a matter of law………………………… 23

    C. Plaintiffs' loss of consortium claims fail as a matter of law……………… 25

CONCLUSION…………………………………………………….. 26

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................ 10

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........................................................ 10

*Cernansky v. Lefebvre*,
2016 U.S. Dist. LEXIS 174002 (D. Vt. Dec. 15, 2016) ............................ 18, 19

*Cooperman v. David*,
214 F.3d 1162 (10th Cir. 2000) ........................................ 17

*Feller v. First Interstate Bancsystem, Inc.*,
299 P.3d 338 (Mont. 2013) ........................................ 23, 24

*Ferrari v. Grand Canyon Dories*,
32 Cal. App. 4th 248 (1995) ........................................ 18

*Gourneau v. Hamill*,
311 P.3d 760 (Mont. 2013) ........................................ 15, 16

*Horphag Research Ltd. v. Garcia*,
475 F.3d 1029 (9th Cir. 2007) ........................................ 10

*Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l LLC*,
632 F.3d 1056 (9th Cir. 2011) ........................................ 11

*Matsushita Elec. Indus. Co. Ltd., v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ........................................ 10

*Moser v. Ratinoff*,
105 Cal. App. 4th 1211 (2003) ........................................ 19

*N. Pac. Ins. Co. v. Stucky*,
338 P.3d 56 (Mont. 2014) ........................................ 25, 26

*Nalwa v. Cedar Fair, L.P.*,
55 Cal. 4th 1148 (Cal. 2012) ........................................ 17

*Peris v. Safeco Ins. Co.*,
916 P.2d 780 (Mont, 1996) ........................................ 11

*Record v. Reason*,
73 Cal. App. 4th 472 (1999) ........................................ 18

*Regents of Univ. of Cal. v. Superior Court*,
41 Cal. App. 4th 1040 (1996) ........................................ 19, 22

*Renville v. Fredrickson*,
101 P.3d 773 (Mont. 2004) ........................................ *passim*

*Ricci v. DeStefano*,
   557 U.S. 557 (2009) ........................................................................ 10

*Sacco v. High Country Indep. Press*,
   896 P.2d 411 (Mont. 1995) ....................................................... 6, 23, 25

*Taylor v. Baseball Club of Seattle*,
   130 P.3d 835 (Wash. App. 2006) ...................................................... 19

*Wood v. County of San Joaquin*,
   111 Cal. App. 4th 960 (2003) ..................................................... 17-18

*Zetwick v. Cnty. of Yolo*,
   850 F.3d 436 (9th Cir. 2017) ............................................................ 10

## Statutes

California Civil Code § 831.7 ................................................................ 18

Mont. Code Ann. § 1–2–101 ................................................................. 11

Mont. Code Ann. § 23–2–733, et seq. ................................................. 16

Mont. Code Ann. § 27–1–751, et seq. ................................................. 11

Mont. Code Ann. § 27–1–752 ........................................................ *passim*

Mont. Code Ann. § 27–1–753 ........................................................ *passim*

12 Vermont Statues Annotated § 1037 ................................................18

Wyoming Statutes 1–1–123 ................................................................ 17

## Rules

Fed. R. Civ. P. 1 ................................................................................. 10

Fed. R. Civ. P. 56(e)(2) ...................................................................... 10

This brief supports the summary judgment motion of Defendant James Yeager, d/b/a Jim Yeager Outfitters ("Yeager") on the claims against him in this action. There are no genuine issues of material fact, and as a matter of law, Yeager is entitled to a summary judgment on those claims.

## **INTRODUCTION**

This action arises from the accidental drowning death of Charles P. McJunkin ("McJunkin") while participating in a guided float fishing trip on the Stillwater River on July 17, 2014. Falling out of a raft and/or drowning while floating on Montana rivers is a risk that is characteristic of and intrinsic to the recreational activity and is not actionable under Montana law.

The Montana legislature, in an effort to maintain the economic viability of the sports and recreational industries, enacted statutes immunizing providers of sports and recreational activities from liability for accidents caused by "inherent risks" of those activities, and defined this term as "those dangers or conditions that are characteristic of, intrinsic to, or an integral part of any sport or recreational activity and that cannot be prevented by the use of reasonable care." Mont. Code Ann. § 27–1–752(1). Plaintiffs must accept legal responsibility for all injury or death to McJunkin resulting from the inherent risks of river floating and fly fishing. Mont. Code Ann. § 27–1–753(1). McJunkin's death was caused by a risk inherent in river floating and fly fishing; accordingly, Plaintiffs' negligence claim

against Yeager fails as matter of law, and must be dismissed with prejudice pursuant to Rule 56(a) of the Federal Rules of Civil Procedure.

Additionally, Plaintiffs' claims for negligent infliction of emotional distress ("NIED") and loss of consortium fail because: (1) absent an actionable predicate act of negligence, there can be no liability for NIED or loss of consortium; and (2) with respect to NIED specifically, the emotional distress experienced by Plaintiffs, if any, owing to McJunkin's death was not "serious" or "severe" enough to be compensable under Montana law. *See Sacco v. High Country Indep. Press*, 896 P.2d 411, 426 (Mont. 1995); *Renville v. Fredrickson*, 101 P.3d 773, ¶¶ 10–16 (Mont. 2004).

## UNDISPUTED FACTS

McJunkin drowned while participating in a guided float fishing trip on the Stillwater River on July 17, 2014. (Statement of Undisputed Facts ("SUF"), ¶ 1.) McJunkin was 81 years old at the time of his death, and had been fly fishing with Yeager repeatedly for 19–20 years. (*Id.*, ¶ 2.)

Yeager received his Montana Outfitters License in 1996, having demonstrated the requisite experience and skill necessary to be licensed by the Montana Board of Outfitters & Guides, and had previously been guiding under the supervision of an outfitter since 1993. (*Id.*, ¶ 3.) Throughout his career as an outfitter and fly fishing guide, he primarily operated on the Stillwater and

Yellowstone Rivers.  (*Id*., ¶ 4.)  Yeager was certified to perform CPR.  (*Id*., ¶ 5.)
In his nearly 25 years of outfitting and guiding, Yeager had not a single blemish on
his record with the Montana Board of Outfitters & Guides.  (*Id*., ¶ 6.)

In the week preceding July 17, 2014, McJunkin float fly fished the Stillwater
River, from Johnsons Bridge to Swinging Bridge, three times, guided each time by
Yeager.  (*Id.*, ¶ 7.)  During those fly fishing trips, as was Yeager's custom and
practice, he used the Swinging Bridge Fishing Access Site for a take-out at the end
of the day.  (*Id*., ¶ 8.) The Swinging Bridge take-out is approximately one-quarter
mile above a set of rapids known as the Beartooth Drop.  (*Id.*, ¶ 9*.*)  Yeager had
never floated McJunkin or fly fished with McJunkin through the Beartooth Drop,
and had no intention of floating through or fishing the Beartooth Drop on July 17,
2014.  (*Id.,* ¶ 10.)

Yeager's raft was equipped with the legally-mandated personal flotation
devices, which were readily available for McJunkin's use.  (*Id.*, ¶ 11.)  There were
at least three personal flotation devices—either on the chairs of the raft, under the
front seat of the raft, or on the floor of the raft.  (*Id.*, ¶ 12.)  Yeager and McJunkin
had conversations over the years regarding McJunkin's use of personal flotation
devices, however, McJunkin refused at all times to wear a personal flotation device
while floating or fly fishing.  (*Id.*, ¶ 13.)  Yeager was unable to persuade McJunkin
at any time to wear a personal flotation device while floating or fly fishing.  (*Id*.,

¶ 14.) Despite its ready availability, McJunkin refused to wear and was not wearing a personal flotation device on July 17, 2014. (*Id.*, ¶ 15.)

The Stillwater River conditions encountered by Yeager on July 17 were characteristic of and consistent with conditions he previously encountered on that stretch of river. (*Id.*, at ¶ 16.) Yeager approached the Swinging Bridge take-out on July 17 in the same manner as he had on the three previous days of fishing with McJunkin. (*Id.*, ¶ 17.) He crossed an underwater shelf of rocks. (*Id.*, ¶ 18.) McJunkin, in the front of the boat, went through/past the shelf, then Yeager went through/past the shelf. (*Id.*, ¶ 19.) As the rear of the raft came through the shelf, the boat rocked sideways, a wave came over the top of the raft, and McJunkin fell out of the boat. (*Id.*, ¶ 20.)

Yeager yelled to McJunkin to swim to shore, but McJunkin swam toward the raft. (*Id.*, ¶ 21.) Yeager then attempted to position the raft such that McJunkin could grab ahold of it, after which Yeager planned to row McJunkin to shore. (*Id.*, ¶ 22.) Yeager, McJunkin, and the raft began to pick up speed. (*Id.*, ¶ 23.) The party floated past the Swinging Brideg take-out point, quickly approaching the Beartooth Drop. (*Id.*, ¶ 24.) Yeager made contact with McJunkin and nearly pulled him into the raft. (*Id.*, ¶ 25.) Yeager then realized that McJunkin's partner, Julie Garner ("Garner")—who had been sitting in the back seat of the raft the entire time—had fallen into the water as well. (*Id.*, ¶ 26.)

Yeager then faced a critical decision. As he attempted to pull McJunkin fully into the raft, Garner yelled to Yeager that she could not swim. (*Id.*, ¶ 27.) Yeager made the split-second determination to let go of McJunkin and attempt to save Garner, fearing that she would drown otherwise. (*Id.*, ¶ 28.) As they entered the Beartooth Drop, Yeager was able pull Garner aboard, then successfully navigate through the rapid and around the bridge piers that followed it with his one remaining oar. (*Id.*, ¶ 29.) McJunkin, meanwhile, lost contact with Yeager and the raft, proceeded to float in the water through the rapid, and ultimately did not survive. (*Id.*, ¶ 30.) McJunkin's body was recovered by Stillwater County Search & Rescue in a back channel downstream of the Beartooth Drop. (*Id.*, ¶ 31.)

Plaintiff filed this action on January 26, 2017. (Doc. 1.) They claim that Yeager's negligence caused McJunkin's death on July 17, 2014, and allege three counts in their Complaint: (1) negligence; (2) NIED; and (3) loss of consortium. (*Id.*, ¶¶ 26–29.) Plaintiffs moved to amend their Complaint on November 29, 2017. The motion—opposed by Yeager—remains pending.

## LEGAL STANDARD

**A.    Summary judgment**

Summary judgment motions are not a procedural shortcut. They are an integral part of the Federal Rules of Civil Procedure, and they serve the purpose of

a just, speedy, and inexpensive determination of the action. Fed. R. Civ. P. 1; *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

Rule 56(c) provides that summary judgment shall be granted as a matter of law if the pleadings, discovery, and affidavits show no genuine issue of material fact exists. The moving party bears the initial burden of establishing that no genuine issue of material fact exists. *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007). Once this burden has been met, the opposing party then bears the burden of showing specific facts that establish a genuine issue on all elements of the case. *Celotex Corp.*, 477 U.S. at 322–24. In doing so, the opposing party "may not rely merely on allegations or denials in its own pleading." Fed. R. Civ. P. 56(e)(2). The opposing party's evidence must be "significantly probative" and "more than merely colorable"; only disputes over facts that might affect the outcome of the suit under the governing law are considered "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–250 (1986).

Moreover, where the record taken as a whole could not lead a rational trier of fact to find for the plaintiff, there is no "genuine issue for trial" and summary judgment in favor of the defendant should be granted. *See Matsushita Elec. Indus. Co. Ltd., v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

**B.     Applicable law**

A federal court sitting in diversity applies the substantive law of the forum

state to state law claims.  *Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l LLC*,

632 F.3d 1056, 1060 (9th Cir. 2011).  Thus, Montana law regarding negligence,

NIED, and loss of consortium controls the substantive analysis of Plaintiffs'

claims.

## ARGUMENT

McJunkin's drowning death on July 17, 2014 resulted from an inherent risk

of fishing from a raft while floating on a river.  Plaintiffs cannot—indeed, do not—

argue that drowning is anything but an inherent risk of recreating on water.

Consequently, as a matter of law, Plaintiffs' negligence claim fails.  For the same

reasons, and because Plaintiffs cannot prove actionable emotional distress under

Montana law, Plaintiffs' NIED and loss of consortium claims fail as well.

**A.     Plaintiffs' claims are barred by Montana's Recreation Responsibility
Act ("the Act"), Montana Code Ann. § 27–1–751, et seq.**

**1.     The scope of the Act.**

By its plain terms,[1] the Act limits the liability of recreational opportunity

providers—such as Yeager—for injuries resulting from risks inherent to a

---

[1] Montana law compels a court interpreting a statute to give effect to the intent of the Legislature, if possible. *Peris v. Safeco Ins. Co.*, 916 P.2d 780, 783 (Mont. 1996).  When the words of the statute clearly indicate the Legislature's intent, the courts "may not go further or apply other means of construction." *Id.*  "[W]hen the language of a statute is plain, unambiguous, direct and certain, the statute speaks for itself and there is nothing left for the Court to construe." *Id.* at 784.  The courts must construe statutes by their terms and may not insert what has been omitted or omit what has been inserted.  Mont. Code Ann. § 1–2–101.

recreational activity—such as boating or fly fishing. The Act's "limitation on liability" language includes, in pertinent part, the following key provisions:

> (1) A person who participates in any sport or recreational opportunity <u>assumes the inherent risks in that sport or recreational opportunity</u>, whether those risks are known or unknown, <u>and is legally responsible for all injury or death to the person and for all damage to the person's property that result from the inherent risks in that sport or recreational opportunity</u>.

> (2) A provider is <u>not required to eliminate, alter, or control the inherent risks</u> within the particular sport or recreational opportunity that is provided.

> (3)(a) Sections 27–1–751 through 27–1–754 do not preclude an action based on the negligence of the provider <u>if the injury, death, or damage is not the result of an inherent risk of the sport or recreational opportunity</u>.

Mont. Code Ann. § 27–1–753(1), (2), (3)(a) (emphases added). Taken together, recreationalists in Montana assume the risk of injury resulting from risks inherent in a recreational activity; providers have no duty to eliminate the risks inherent to that recreational activity; and, critically, legal action against a provider may be maintained <u>only if</u> the alleged injury was the result of something other than a risk inherent in the recreational activity. If a participant's injury results from an inherent risk, the participant simply cannot recover from the provider.

The Act specifically defines several of the terms used in the above-excerpted section, as follows:

(2) "Inherent risks" means those dangers or conditions that are <u>characteristic of, intrinsic to, or an integral part of</u> any sport or recreational activity and that <u>cannot be prevented by the use of reasonable care</u>.

(3) "Provider" means a person, corporation, partnership, or other business entity, including a governmental entity as defined in 2–9–111, that promotes, offers, or conducts a sport or recreational opportunity for profit or otherwise.

(4) "Sport or recreational opportunity" means any sporting activity, whether undertaken with or without permission, including but not limited to baseball, softball, football, soccer, basketball, bicycling, hiking, swimming, <u>boating</u>, hockey, dude ranching, nordic or alpine skiing, snow boarding, snow sliding, mountain climbing, <u>river floating</u>, whitewater rafting, canoeing, kayaking, target shooting, hunting, <u>fishing</u>, backcountry trips, horseback riding and other equine activity, snowmobiling, off-highway vehicle use, agritourism, an on-farm educational opportunity, and any similar recreational activity.[2]

Mont. Code Ann. § 27–1–752(2), (3), (4) (emphasis added).

The Montana Legislature drafted and enacted the Act with the expressed purposes of limiting providers' liability and requiring participants to assume the very risks they choose—and pay—to encounter.  The Legislature passed the Act as HB 150 of the 2009 legislative session, and included the following Preamble in the final bill:

---

[2] Notable with respect to the definition of "sport or recreational opportunity" is the Montana Legislature's distinction between river floating and whitewater rafting.  While neither activity is itself defined in the Act, the Legislature unmistakably recognized a continuum of risk pertaining to boating and/or floating on Montana rivers.  Thus, all "river floating" is not properly characterized as "whitewater rafting," and the Legislature purposefully distinguished between the two.

WHEREAS, all sports and recreational activities involve inherent risks that provide the challenge and excitement that entice recreationists to participate in those activities; and

WHEREAS, recreationists should accept the risks inherent in sports and recreational activities and be responsible for injury or damage resulting from those inherent risks; and

WHEREAS, the state has a legitimate interest in maintaining the economic viability of the sports and recreational industries by discouraging claims based on damages resulting from risks inherent in a sport or recreational activity; and

WHEREAS, providers of recreational opportunities should not be required to alter the challenge and excitement of recreational activities by controlling risks inherent in the activities; and

WHEREAS, the liability of providers of recreational opportunities should be limited to negligence that is not associated with the inherent risks of a sport or recreational activity.

2009 MT Laws 331, preamble. At the January 13, 2009 House Judiciary Committee hearing introducing HB 150, Tracey Knutson—who herself drafted the bill—testified that when a participant is injured as a result of an inherent risk of a recreational activity, the Act mandates that the provider has no legal duty with respect to negligence. Test. Tracey Knutson, House Jud. Comm. (Jan. 13, 2009) (audio available at http://leg.mt.gov/css/Video-and-Audio/archives/av.asp). The purposes of the Act include: (1) ensuring "that providers are not put in the position

where they have to control absolutely everything that happens in the field, in their activity"; and (2) protecting the viability of the recreation industry by easing the cost burden on providers of purchasing liability insurance. *Id.*

The crux of the Act—and to its applicability to this case—is whether McJunkin's death was the result of an inherent risk of float fly fishing. The facts and relevant case law leave no choice but to conclude that it was.

### 2. Inherent risk.

Pursuant to the Act, whether a provider is liable when a participant is injured in the course of participating in a recreational activity depends on whether a risk inherent in the activity caused the injury. Here, there can be no doubt that McJunkin's injury was caused by falling out of Yeager's raft into the Stillwater River while fishing on July 17, 2014. Falling out of a boat and into the water is the primary risk inherent in boating and float fly fishing. Summary judgment is appropriate

The text of the Act and legislative testimony indicate that inherent risk analysis bears on the duty element of a negligence claim. Mont. Code Ann. § 27–1–753(2) ("[a] provider is not required to eliminate, alter, or control the inherent risks," i.e. has not duty); Test. Knutson, House Jud. Comm. (Jan. 13, 2009), *supra*. Whether a legal duty exists is a question of law for the courts. *Gourneau v. Hamill*, 311 P.3d 760, ¶ 10 (Mont. 2013); *see also* Test. Knutson, House Jud.

Comm. (Jan. 13, 2009) (the Act serves as a "procedural instruction to the judiciary to examine whether the risk that was encountered by a plaintiff-participant actually was an inherent risk or not"). If an injury is caused by an inherent risk and there is no legal duty, then there can be no negligence. *Gourneau*, ¶¶ 9, 12 ("in the absence of duty, there is no negligence," and "if the moving party establishes that any one element of negligence lacks a genuine issue of material fact, . . . summary judgment is proper").

As mentioned above, the Act defines "inherent risks" as "those dangers or conditions that are characteristic of, intrinsic to, or an integral part of any sport or recreational activity and that cannot be prevented by the use of reasonable care." Mont. Code Ann. § 27–1–752(2). Unlike Montana's Skier Responsibility Act, Montana Code Annotated § 23–2–733 *et seq*., which codifies a non-exhaustive list of risks inherent in the sport of snow skiing, the Act does not list out the inherent risks of the various activities enumerated in § 27–1–752(4). This was purposeful—the Act was drafted as an omnibus bill, with the intent of incorporating all inherent risks as determined on an activity-by-activity basis. Test. Tracey Knutson, Senate Jud. Comm. (Mar. 11, 2009) (audio available at http://leg.mt.gov/css/Video-and-Audio/archives/av.asp). No Montana court has interpreted the Act since its passage, and thus no Montana court has expounded on the idea of inherent risk or determined what risks are inherent to boating, river

floating, and/or fishing. However, "[j]udges deciding inherent risk questions . . . may consider not only their own or common experience with the recreational activity involved but may also consult case law, other published materials, and documentary evidence introduced by the parties on a motion for summary judgment." *Nalwa v. Cedar Fair, L.P.*, 55 Cal. 4th 1148, 1158 (Cal. 2012)

Several states have recreation statutes similar to the Act, and both the text of those statutes and case law interpreting them is helpful here. For example, Wyoming Statutes 1–1–123, which the Montana Legislature used as the model for the Act, contains nearly the exact same provisions as § 27–1–753(1), (2), and 3(a). Interpreting the Wyoming law in a case involving whether a loose saddle was an inherent risk of horseback riding, the Tenth Circuit Court of Appeals noted that an inherent risk "is an undesirable risk which is simply a collateral part of the sport." *Cooperman v. David*, 214 F.3d 1162, 1168 (10th Cir. 2000).

Likewise, California Civil Code § 831.7, which applies to public entities and employees, provides that a participant injured in a "hazardous recreational activity"—including "boating"—may only sustain an action against the entity or employee facilitating the activity if the condition that caused the injury "is not reasonably assumed by the participant as inherently a part of the hazardous recreational activity out of which the damage or injury arose." Interpreting this provision, the California Court of Appeal in *Wood v. County of San Joaquin*, 111

Cal. App. 4th 960, 963 (2003) (citations omitted), determined that the risks

inherent to canoeing include the canoe sinking or a passenger falling overboard,

because the "wave action that causes a boat to pitch and churn is a natural danger

of boating." *See also Record v. Reason*, 73 Cal. App. 4th 472, 484–85 (1999)

(holding that high speed, sharp turns, and the possibility of falling into the water

were all inherent risks of water tubing); *Ferrari v. Grand Canyon Dories*, 32 Cal.

App. 4th 248, 253–54 (1995) ("[W]hite water rafting has certain inherent risks.

For example, violent movement of the raft while traversing rapids can cause the

raft to overturn or the occupants to be thrown into the water where they risk

striking rocks or even drowning. The risk of being thrown involuntarily about

inside the raft and colliding with objects or people therein is also an inherent part

of the activity.").

Similarly, 12 Vermont Statues Annotated § 1037 provides that "a person

who takes part in any sport accepts as a matter of law the dangers that inhere

therein insofar as they are obvious and necessary." In *Cernansky v. Lefebvre*, 2016

U.S. Dist. LEXIS 174002 at **7–10 (D. Vt. Dec. 15, 2016), the Vermont federal

district court interpreted this statute and prior Vermont cases to conclude that the

risk of falling off a longboard skateboard while traveling at high speed was

inherent to the sport, and therefore an action could not be maintained against the

owner of the skateboard. The court found that the decision to operate the

skateboard at high speed meant that the risk of injury from losing one's balance could not be eliminated. *Id.*

Just as the Act defines an inherent risk as one that cannot be prevented through the use of reasonable care, courts have identified inherent risks as those that cannot be prevented or eliminated without fundamentally altering the sport in question. *See e.g. Moser v. Ratinoff*, 105 Cal. App. 4th 1211, 1222 (2003) ("[O]ne cyclist riding alongside another cyclist and swerving into the latter is a risk that is inherent in a long-distance, recreational group bicycle ride," and "[i]f liability attached to entanglements and collisions among 600 bicycle riders, the recreational sport of an organized bicycle ride likely would be adversely affected."); *Taylor v. Baseball Club of Seattle*, 130 P.3d 835, 838 (Wash. App. 2006) (holding that being struck by a baseball during warm-up at a professional baseball game was an inherent risk of the activity because "warm-ups are integral to the game of baseball"); *Regents of Univ. of Cal. v. Superior Court*, 41 Cal. App. 4th 1040, 1047 (1996) ("Falling, whether because of one's own slip, a co-climber's stumble, or an anchor system giving way, is the very risk inherent in the sport of mountain climbing and cannot be completely eliminated without destroying the sport itself.")

Yeager's expert witness, a veteran Montana fly fishing guide and outfitter, expresses the following opinions with respect to the risks inherent in float fly fishing:

On any given day on the river, the circumstances are ever-changing: wind, waves, weather, water temperatures, and water flow conditions. The substrate under the water, consisting of sand, rocks, boulders, shelf rock, heavy weed growth, ranch trash, and sunken car bodies, is continually in a state of flux. Each of these conditions and variables interact to create a level of risk inherent in float fly fishing.

Furthermore, there are circumstances where water craft are upended and/or <u>participants end up in the water for a variety of reasons</u>. Moving water is very powerful and at times unpredictable. <u>Even slight movements of a raft can cause an off-balance passenger to fall out of his seat and out of the boat</u>. The most skillful guide in the business can recall unnerving occasions where unplanned situations arose. Thus, underline{participants can end up unintentionally swimming, sometimes through uneven or rough water. Being thrown around in a raft and falling out of a raft are risks inherent in the sport of float fly fishing, and river floating in general. Drownings do occur on the rivers of Montana. This too is an inherent risk in float fishing and river floating in general.}

All of the above constitute the inherent risks of float fly fishing, as contemplated in Montana's Recreation Responsibility Act, Montana Code Annotated § 27–1–752(2), which defines "inherent risks" as "those dangers or conditions that are characteristic of, intrinsic to, or an integral part of any sport or recreational activity and that cannot be prevented by the use of reasonable care." <u>To remove the above-listed risks and conditions from the sport of float fly fishing would be to remove characteristic, integral, and defining aspects of the sport. To fully mitigate these risks, one would have to opt not to participate at all</u>.

(SUF, ¶ 32 (emphases added).) There is no genuine dispute that a risk inherent to

floating in a raft on a river is falling out of the raft into the water.  The risk is part and parcel of the activity.

Plaintiffs' sworn testimony is consistent with the above expert opinions and case law.  When asked if he "[w]ould . . . agree that a risk of floating on a river, or really any body of water, is falling out of the boat," McJunkin's son Rhett McJunkin replied "[y]eah, I would think so."  (*Id*., ¶ 33.)  Rhett further testified as follows with respect to the risk of drowning:

> Q.  How about a drowning?  Is that a risk of floating on a river or floating in water, in general?
> A.· In this case, I think, yeah.
> Q.· In general would you say that's a risk?
> A.· Yeah.  There is drownings that happen, yeah.  I guess if you're—I would guess <u>that would be a risk of being around water</u>.

(*Id*., ¶ 34 (emphasis added).)  Likewise, McJunkin's son Charles McJunkin, Jr. testified that he would "consider falling out of a boat a possibility while floating on a river," and that drowning is a potential risk if one falls out of a boat.  (*Id*., ¶ 35.)

The above compels the conclusion that McJunkin's death was caused by an inherent risk of float fly fishing, and that Plaintiffs' claims are barred by the Act as a result.  McJunkin fell from Yeager's raft after they encountered chop or unevenness in the surface of the Stillwater River on July 17, 2014.  The characteristics of the river were consistent with other times McJunkin and Yeager had floated the stretch at issue.  McJunkin and Yeager had been through this

section of river before, in previous days and in prior years, and nothing out of the ordinary occurred that day. Yeager had discussed the use of personal flotation devices with McJunkin, but McJunkin opted not to wear one. McJunkin understood the inherent dangers of floating the Stillwater, which, pursuant to *Wood* and both expert witnesses' opinions, include the possibility of being thrown from the raft as a result of wave action and changes in pitch. As Plaintiffs themselves noted, falling out of a boat and drowning are the risks of being around and recreating on water. Furthermore, there is no practicable way to eliminate these risks, nor was Yeager required to eliminate them. The only way to fully prevent falling out of a boat into a river is to avoid floating rivers in boats. Similar to *Regents of University of California*, falling out of the boat "is the very risk inherent in the sport of [float fly fishing] and cannot be completely eliminated without destroying the sport itself." 41 Cal. App. 4th at 1047.

Both the condition which caused McJunkin to fall from the raft and his consequent drowning are textbook inherent risks of water-based recreation. Accordingly, because McJunkin's death was the result of the inherent risks of float fly fishing, including but not limited to encountering uneven water and being ejected from Yeager's raft, the Act bars Plaintiffs' claims and summary judgment on Count I of Plaintiffs' Complaint is warranted.

**B.      Plaintiffs' NIED claims fail as a matter of law.**

Section 27–1–753(3)(a) of the Act provides that "an action based on the negligence of the provider" is barred if the injury, death, or damage is . . . the result of an inherent risk of the sport or recreational opportunity."  Consequently, for the reasons stated above, Plaintiffs' NIED claims fail as a matter of law.  An NIED claim is, by definition, a claim based upon negligence.  *Sacco v. High Country Indep. Press*, 896 P.2d 411, 426 (Mont. 1995)  Absent an actionable predicate act of negligence on Yeager's part, there can be no liability for NIED.

However, even assuming Yeager could be liable in negligence for McJunkin's death, there is insufficient evidence in the record for a jury to find that the emotional distress Plaintiffs experienced following the death of their father was "serious" or "severe" under Montana law.  The Court should therefore grant Yeager's motion for summary judgment on Count II of Plaintiffs' Complaint, even if it denies the motion on Count I.

It is well-settled in Montana that "a plaintiff's independent or 'stand alone' claim for intentional or negligent infliction of emotional distress can be maintained only upon a showing that the plaintiff suffered 'serious' or 'severe' emotional distress as the reasonably foreseeable consequence of the defendant's act or omission."  *Feller v. First Interstate Bancsystem, Inc.*, 299 P.3d 338, ¶ 34 (Mont. 2013) (citing *Sacco*, 896 P.2d at 428).  "To constitute 'serious' or 'severe,' the

emotional distress must be so severe no reasonable person could be expected to endure it." *Id*. (citations omitted). The Montana Supreme Court has considered the following factors in determining whether purported emotional distress is serious or severe enough to support an NIED claim: (1) whether the claimant suffered physical manifestations of emotional distress; (2) whether the claimant sought counseling; (3) whether the claimant took medication, such as anti-depressants; (4) whether the claimant experienced prolonged sleeplessness or loss of appetite; (5) whether the claimant was able to maintain close family relationships; (6) the duration of the emotional distress; and (7) whether the claimant witnessed the distressing event. *Id*., ¶ 36 (citing *Renville v. Fredrickson*, 101 P.3d 773, ¶¶ 14–15 (Mont. 2004)).

Here, Plaintiffs' sworn testimony fails to support their NIED claims. While Plaintiffs testified during their depositions that they experience occasional trouble sleeping and nightmares concerning the loss of their father, neither Rhett McJunkin nor Charles McJunkin, Jr. witnessed the accident, have sought counseling, take medication to manage their emotional distress, have a loss of appetite, or are unable to maintain close family relationship. (SUF, ¶ 36.) Indeed, Plaintiffs both testified that while they continue to grieve, they have carried on with their lives with the help of family and prayer. (*Id*., ¶ 37.)

Just as the Montana Supreme Court noted in *Renville*, separate from any sympathy for Plaintiffs' loss, there is insufficient evidence to support the claim that Plaintiffs' emotional distress is so serious or severe that no person could be expected to endure it.  101 P.3d 773, ¶¶ 14–15.  The Court should therefore grant Yeager's motion for summary judgment on Count II of Plaintiffs' Complaint.

**C.     Plaintiffs' loss of consortium claims fail as a matter of law.**

Just as Plaintiffs' negligence and NIED claims fail by operation of the Act, so too do their loss of consortium claims.  Montana law requires an underlying tortious act to support a loss of consortium claim, and Plaintiffs cannot prove Yeager acted tortiously under the circumstances.  *N. Pac. Ins. Co. v. Stucky*, 338 P.3d 56, ¶ 2 (Mont. 2014); Mont. Pattern Jury Instr. Civ. 25.32 (Damages—Loss of Consortium).  Consequently, the Court should enter summary judgment on Count III of Plaintiffs' Complaint.

However, even assuming Yeager could be liable in negligence for McJunkin's death, there is insufficient evidence in the record to support a loss of consortium claim under Montana law.  The Court should therefore grant Yeager's motion for summary judgment on Count III of Plaintiffs' Complaint, even if it denies the motion on Count I.

"Montana law recognizes a claim for loss of consortium brought by the adult child of an injured parent."  *Stucky*, ¶ 38.  "In establishing his or her claim, the

plaintiff may present evidence of factors including but not limited to . . . the actual effect the parent's injury has had on the relationship and is likely to have in the future; the child's age; the nature of the child's relationship with the parent; and the child's emotional, physical and geographic characteristics." *Id*.

Here, Plaintiffs' testimony is insufficient to establish a claim for loss of consortium under the above factors. Rhett McJunkin and Charles McJunkin, Jr., both of whom are in their late 50's/early 60's, lived hundreds of miles away from their father, received no financial support from their father, saw their father only occasionally, and, as discussed above, have experienced no exceptional emotional circumstances as a result of their father's death. (SUF, ¶ 38.)

## CONCLUSION

Based on the foregoing, Yeager is entitled to judgment as a matter of law on each of Plaintiffs' three claims. The Act is clear—when injury to one participating in a recreational activity is the result of a risk inherent to that activity, the provider is not liable in negligence whatsoever. McJunkin's death was the result of the risks inherent in float fly fishing the rivers of Montana. Plaintiffs' claims are barred and the Court should enter summary judgment in Yeager's favor.

DATED this 12th day of February, 2018.

/s/Ross D. Tillman
Ross D. Tillman
BOONE KARLBERG P.C.
*Attorneys for Defendant James*
*Yeager d/b/a Jim Yeager Outfitters*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief, excluding the caption, certificate of compliance, and signature block, contains 5,519 words, as calculated by the word-processing software used to draft the brief, and utilizes a proportionately-spaced Times New Roman font of 14 points.

/s/Ross D. Tillman
Ross D. Tillman
BOONE KARLBERG P.C.
*Attorneys for Defendant James*
*Yeager d/b/a Jim Yeager Outfitters*
