Ross D. Tillman
John M. Newman
BOONE KARLBERG P.C.
201 West Main, Suite 300
P.O. Box 9199
Missoula, MT 59807-9199
Telephone: (406)543-6646
Facsimile:  (406) 549-6804
rtillman@boonekarlberg.com
jnewman@boonekarlberg.com
*Attorneys for Defendant James Yeager*
 *d/b/a Jim Yeager Outfitters*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| CHARLES P. McJUNKIN, deceased, by and through his executor and personal representative, RHETT McJUNKIN, and RHETT McJUNKIN, executor and personal representative, on behalf of the heirs of CHARLES P. McJUNKIN,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>JAMES YEAGER d/b/a JIM YEAGER OUTFITTERS,<br><br>　　　　　Defendant. | Cause No. CV-17-12-BLG-SPW-TJC<br><br>**DEFENDANT JAMES YEAGER'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Rule 56.1(a) of the District Court Local Rules, Defendant James

Yeager d/b/a Jim Yeager Outfitters files the following statement of undisputed

1

facts in support of his motion for summary judgment:

1. McJunkin drowned while participating in a guided float fishing trip on the Stillwater River on July 17, 2014. (Coroner's Report (July 14, 2017), attached as **Exhibit A**.)

2. McJunkin was 81 years old at the time of his death, and had been fly fishing with Yeager repeatedly for 19–20 years. (Depo. Jim Yeager, 12:24–13:8 (Sept. 19, 2017), entire transcript attached as **Exhibit B**.)

3. Yeager received his Montana Outfitters License in 1996, having demonstrated the requisite experience and skill necessary to be licensed by the Montana Board of Outfitters & Guides, and had previously been guiding under the supervision of an outfitter since 1993. (Yeager Outfitter File, attached as **Exhibit C**.)

4. Throughout his career as an outfitter and fly fishing guide, he primarily operated on the Stillwater and Yellowstone Rivers. (*Id*., **Exhibit C**.)

5. Yeager was certified to perform CPR. (*Id*., **Exhibit C**.)

6. In his nearly 25 years of outfitting and guiding, Yeager had not a single blemish on his record with the Montana Board of Outfitters & Guides. (*Id*., **Exhibit C**.)

7. In the week preceding July 17, 2014, McJunkin float fly fished the Stillwater River, from Johnsons Bridge to Swinging Bridge, three times, guided

2

each time by Yeager. (Aff. Jim Yeager (Feb. 12, 2018), attached as **Exhibit D**.)

8. During those fly fishing trips, as was Yeager's custom and practice, he used the Swinging Bridge Fishing Access Site for a take-out at the end of the day. (*Id.*, **Exhibit D**.)

9. The Swinging Bridge take-out is approximately one-quarter mile above a set of rapids known as the Beartooth Drop. (Depo. Yeager, 21:10–12, **Exhibit B**.)

10. Yeager had never floated McJunkin or fly fished with McJunkin through the Beartooth Drop, and had no intention of floating through or fishing the Beartooth Drop on July 17, 2014. (Depo. Yeager, 53:4–10, **Exhibit B**; Aff. Yeager, **Exhibit D**.)

11. Yeager's raft was equipped with the legally-mandated personal flotation devices, which were readily available for McJunkin's use. (Depo. Yeager, 50:4–16, **Exhibit B**.)

12. There were at least three personal flotation devices—either on the chairs of the raft, under the front seat of the raft, or on the floor of the raft. (*Id.*, **Exhibit B**.)

13. Yeager and McJunkin had conversations over the years regarding McJunkin's use of personal flotation devices, however, McJunkin refused at all times to wear a personal flotation device while floating or fly fishing. (Aff.

Yeager, **Exhibit D**.)

14. Yeager was unable to persuade McJunkin at any time to wear a personal flotation device while floating or fly fishing. (*Id.*, **Exhibit D**.)

15. Despite its ready availability, McJunkin refused to wear and was not wearing a personal flotation device on July 17, 2014. (*Id.*, **Exhibit D**.)

16. The Stillwater River conditions encountered by Yeager on July 17 were characteristic of and consistent with conditions he previously encountered on that stretch of river. (*Id.*, **Exhibit D**.)

17. Yeager approached the Swinging Bridge take-out on July 17 in the same manner as he had on the three previous days of fishing with McJunkin. (*Id.*; Depo. Yeager, 59:10–18, **Exhibit B**.)

18. He crossed an underwater shelf of rocks. (Depo. Yeager, 59:10–18, **Exhibit B**.)

19. McJunkin, in the front of the boat, went through/past the shelf, then Yeager went through/past the shelf. (*Id.*, **Exhibit B**.)

20. As the rear of the raft came through the shelf, the boat rocked sideways, a wave came over the top of the raft, and McJunkin fell out of the boat. (*Id.*, **Exhibit B**.)

21. Yeager yelled to McJunkin to swim to shore, but McJunkin swam toward the raft. (*Id.* at 59:19–20, **Exhibit B**.)

4

22. Yeager then attempted to position the raft such that McJunkin could grab ahold of it, after which Yeager planned to row McJunkin to shore. (*Id*. at 60:4–23, **Exhibit B**.)

23. Yeager, McJunkin, and the raft began to pick up speed. (*Id*. at 61:6, **Exhibit B**.)

24. The party floated past the Swinging Brideg take-out point, quickly approaching the Beartooth Drop. (Depo. Yeager, 61:6–9, **Exhibit B**.)

25. Yeager made contact with McJunkin and nearly pulled him into the raft. (*Id*. at 61:11–13, **Exhibit B**.)

26. Yeager then realized that McJunkin's partner, Julie Garner ("Garner")—who had been sitting in the back seat of the raft the entire time—had fallen into the water as well. (*Id*. at 61:23–62:8, **Exhibit B**.)

27. As he attempted to pull McJunkin fully into the raft, Garner yelled to Yeager that she could not swim. (*Id*., **Exhibit B**.)

28. Yeager made the split-second determination to let go of McJunkin and attempt to save Garner, fearing that she would drown otherwise. (*Id*., **Exhibit B**.)

29. As they entered the Beartooth Drop, Yeager was able pull Garner aboard, then successfully navigate through the rapid and around the bridge piers that followed it with his one remaining oar. (*Id*. at 62:10–63:21, **Exhibit B**.)

30. McJunkin, meanwhile, lost contact with Yeager and the raft,

proceeded to float in the water through the rapid, and ultimately did not survive. (Depo. Yeager, 63:22–64:5, **Exhibit B**.)

31. McJunkin's body was recovered by Stillwater County Search & Rescue in a back channel downstream of the Beartooth Drop. (*Id*. at 67:5–68:15, **Exhibit B**.)

32. Yeager's expert witness, a veteran Montana fly fishing guide and outfitter, expresses the following opinions with respect to the risks inherent in float fly fishing:

> On any given day on the river, the circumstances are ever-changing: wind, waves, weather, water temperatures, and water flow conditions. The substrate under the water, consisting of sand, rocks, boulders, shelf rock, heavy weed growth, ranch trash, and sunken car bodies, is continually in a state of flux. Each of these conditions and variables interact to create a level of risk inherent in float fly fishing.
>
> Furthermore, there are circumstances where water craft are upended and/or <u>participants end up in the water for a variety of reasons</u>. Moving water is very powerful and at times unpredictable. <u>Even slight movements of a raft can cause an off-balance passenger to fall out of his seat and out of the boat.</u> The most skillful guide in the business can recall unnerving occasions where unplanned situations arose. Thus, <u>participants can end up unintentionally swimming, sometimes through uneven or rough water. Being thrown around in a raft and falling out of a raft are risks inherent in the sport of float fly fishing, and river floating in general. Drownings do occur on the rivers of Montana. This too is an inherent risk in float fishing and river floating in general.</u>

> All of the above constitute the inherent risks of float fly fishing, as contemplated in Montana's Recreation Responsibility Act, Montana Code Annotated § 27–1–752(2), which defines "inherent risks" as "those dangers or conditions that are characteristic of, intrinsic to, or an integral part of any sport or recreational activity and that cannot be prevented by the use of reasonable care." <u>To remove the above-listed risks and conditions from the sport of float fly fishing would be to remove characteristic, integral, and defining aspects of the sport. To fully mitigate these risks, one would have to opt not to participate at all</u>.

(David Decker Report, 5 (Nov. 8, 2017) (emphases added), attached as **Exhibit E**.)

33. When asked if he "[w]ould . . . agree that a risk of floating on a river, or really any body of water, is falling out of the boat," McJunkin's son Rhett McJunkin replied "[y]eah, I would think so." (Depo. Rhett McJunkin, 61:2–5 (Oct. 6, 2017), attached as **Exhibit F**.)

34. Rhett further testified as follows with respect to the risk of drowning:

> Q. How about a drowning? Is that a risk of floating on a river or floating in water, in general?
> A.· In this case, I think, yeah.
> Q.· In general would you say that's a risk?
> A.· Yeah. There is drownings that happen, yeah. I guess if you're—I would guess <u>that would be a risk of being around water</u>.

(*Id*. at 62:5–11 (emphasis added), **Exhibit F**.)

35. Likewise, McJunkin's son Charles McJunkin, Jr. testified that he would "consider falling out of a boat a possibility while floating on a river," and

7

that drowning is a potential risk if one falls out of a boat. (Depo. Charles McJunkin Jr., 30:10–16 (Oct. 6, 2017), attached as **Exhibit G**.)

36. While Plaintiffs testified during their depositions that they experience occasional trouble sleeping and nightmares concerning the loss of their father, neither Rhett McJunkin nor Charles McJunkin, Jr. witnessed the accident, have sought counseling, take medication to manage their emotional distress, have a loss of appetite, or are unable to maintain close family relationship. (Depo. Rhett McJunkin, 86:2–93:8, **Exhibit F**; Depo. Charles McJunkin, Jr., 46:4–51:21, **Exhibit G**; Plaintiffs' Responses to Yeager's Request for Production No. 12 and Interrogatory Nos. 12 & 13 (May 4, 2017), attached as **Exhibit H**.)

37. Indeed, Plaintiffs both testified that while they continue to grieve, they have carried on with their lives with the help of family and prayer. (*Id*., **Exhibits F and G**.)

38. Rhett McJunkin and Charles McJunkin, Jr., both of whom are in their late 50's/early 60's, lived hundreds of miles away from their father, received no financial support from their father, saw their father only occasionally, and, as discussed above, have experienced no exceptional emotional circumstances as a result of their father's death. (*See e.g.* Depo. Rhett McJunkin, 95:12–105:9, **Exhibit F**; Depo. Charles McJunkin, Jr., 53:6–60:14, **Exhibit G**.)

DATED this 12th day of February, 2018.

          /s/Ross D. Tillman
          Ross D. Tillman
          BOONE KARLBERG P.C.
          *Attorneys for Defendant James*
          *Yeager d/b/a Jim Yeager Outfitters*