Philip McGrady
MCGRADY LAW
309 Wisconsin Avenue
Whitefish, MT 59937
406-322-8647 (phone)
406-324-7313 (fax)
philip@mcgradylawfirm.com

Attorney for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MONTANA
BILLINGS DIVISION**

| | |
|---|---|
| CHARLES P. MCJUNKIN, deceased, by and through his executor and personal representative, RHETT MCJUNKIN, and RHETT MCJUNKIN, executor and personal representative, on behalf of the heirs of CHARLES P. MCJUNKIN,<br><br>Plaintiffs,<br><br>vs.<br><br>JAMES YEAGER d/b/a JIM YEAGER OUTFITTERS,<br><br>Defendants. | Cause No. CV-17-12-BLG-TJC<br><br>**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

The Plaintiffs (hereinafter collectively "McJunkin") request that this Court deny the motion for summary judgment of the Defendant (hereinafter "Yeager"). As demonstrated below, McJunkin's negligence claim is not barred by the Montana Recreation Responsibility Act

("MRRA"). First, McJunkin has moved for partial summary judgment requesting that the Court declare the MRRA unconstitutional on its face and as applied, and incorporates those arguments herein by reference. (*See* Docs. 28-29). Second, Yeager's argument that McJunkin's drowning death resulted from an "inherent risk," thereby precluding liability for negligence, fails because Yeager ignores the fact that the MRRA still requires a determination as to whether Yeager exercised "reasonable care." *See* Mont. Code Ann. § 27-1-752(2). Thus, Yeager has failed to carry his burden in demonstrating the lack of genuine issues of material fact as to McJunkin's negligence claim.

Furthermore, genuine issues of material fact preclude summary judgment on McJunkin's claims for negligent infliction of emotional distress and loss of consortium. The facts on each of these claims present classic issues of disputed facts that must be resolved by the fact finder.

### SUMMARY OF STATEMENT OF DISPUTED FACTS

On July 17, 2014, Yeager took McJunkin on a guided fishing trip on the Stillwater River. (Statement of Disputed Facts ("SDF"), ¶ 42). McJunkin's partner, Julia Garner, accompanied him, but did not fish. (*Id.*) Yeager's fee for the day was to be $450. (*Id.* at ¶ 43). McJunkin was 81 years old, and he weighed approximately 232 pounds at the time. (*Id.* at ¶¶ 44-45).

Yeager testified that McJunkin's health was "bad" in July of 2014, and that it was obvious from watching him. (*Id.* at ¶ 46). Yeager said that McJunkin was having trouble with his hips, knees, everything from the waist down. (*Id.*) Yeager also noticed deterioration in Julia Garner's mental health, and that she acted "unusual." (*Id.* at ¶ 46).

Nonetheless, as the guide, Yeager was obligated to have knowledge of the hazards he might encounter on a river. (*Id.* at ¶ 48). Yeager is in control of the raft and all the occupants of the raft. (*Id.* at ¶ 49). When Yeager is guiding clients, he tells them "here's my life jackets, if you feel comfortable, put them on. We're not a white water rafting company. We fish, meaning if there's big water we go around it. There's times when we hit rocks, and if you hear the guide say, rock, brace yourself because we are going to hit rocks." (*Id.* at ¶ 50). Yeager also gives a safety speech at the beginning of a float in which he tells clients that when there is a "bad stretch of water down a quarter mile, brace yourself, if you hear the guide say rock, brace yourself, listen to the guide, just listen to the guide." (*Id.* at ¶ 51). As part of the safety speech, Yeager would "show them where the life jackets were, how long the trip was going to be, don't hook the guide, basically that stuff." (*Id.* at ¶ 52). Here, however, Yeager did not discuss with McJunkin or Julia Garner what to do if either of them fell out of the boat. (*Id.* at ¶ 62).

On July 17, 2014, Yeager, McJunkin, and Julia Garner started the float at 9:30 am on the Stillwater River. The plan was to float approximately eight miles from Johnson's Bridge to the Swinging Bridge takeout. (*Id.* at ¶ 54). The Swinging Bridge access is located a quarter of a mile above the Beartooth Drop. (*Id.* at ¶¶ 55-56). The safety equipment in the raft were life jackets, a spare oar, first aid kit, extra clothes, and rain gear. (*Id.* at ¶ 57). Yeager claims it was McJunkin's and Julia Garner's choice whether to wear a life jacket. (*Id.* at ¶ 58).

Due to McJunkin's physical condition, Yeager had to assist him to get in and out of the boat: "it was always awkward. We would sit Charles' butt on the tube and then we would kind of maneuver and then we would life up his legs and try to get those into the boat. Then after you got him in the boat, you have to get under his arms and help him get up in the seat." (*Id.* at ¶ 59). Yeager said he would not allow McJunkin to wade and fish because he would fall. (*Id.* at ¶ 60).

After spending the day of July 17, 2014, fishing, the raft went through waves approximately a quarter of a mile above the Swinging Bridge takeout. The raft hit a wave, and "out he went." (*Id.* at ¶ 63). McJunkin was not doing anything to place himself at risk when he was thrown from the boat. (*Id.* at ¶ 78). Yeager did not give McJunkin any warnings before hitting the wave that knocked McJunkin from the boat. (*Id.* at ¶ 79).

After McJunkin was "pitched out of the boat," (*id.* at ¶ 80), Yeager told McJunkin to swim to shore. (*Id.* at ¶ 64). McJunkin tried to swim back to the boat. Yeager rowed toward McJunkin to try to pick him up. But Yeager had nothing for McJunkin to grab ahold of. (*Id.* at ¶¶ 65-67). By this point, McJunkin had been in the water for approximately a quarter of a mile. Yeager had already missed the takeout at Swinging Bridge, and they were picking up speed as they approached the Beartooth Drop. (*Id.* at ¶ 68).

Then Yeager knocked Julia Garner into the river with his oar. (*Id.* at ¶ 72). Julia said "Jim, I can't swim." (*Id.* at ¶ 71). Yeager let go of McJunkin and got Julia back in the boat. McJunkin "didn't look good" at this point. (*Id.* at ¶¶ 73-75). Yeager and Julia then went through the Beartooth Drop, managing their way through by "sheer luck" as they were at the "mercy of the water." (*Id.* at ¶¶ 29, 76). McJunkin's body was being held by an unidentified man on a small inflatable pontoon boat. (*Id.* at ¶ 77).

Rhett McJunkin called Yeager to get the details of what happened, but Yeager never called him back. (*Id.* at ¶ 81). McJunkin's retained expert witness identified numerous breaches of the standard of care and industry regulations. (*Id.* at ¶¶ 82-84). In fact, McJunkin's expert witness opines that outfitters and guides, like Yeager, should be prepared for the inherent dangers of whitewater and should take basic steps to minimize the inherent dangers. (*Id.* at ¶ 83). Yeager failed to do so. (*Id.* at ¶ 82).

## ARGUMENT

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party has adequately demonstrated it is entitled to judgment as a matter of law. *Summer v. Teichert & Son, Inc.*, 127 F.3d 1150 (9th Cir. 1997). Only when the moving party has satisfied its burden does the non-moving party have to set forth genuine facts showing a genuine issue remains for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). The court must view all such evidence in the light most favorable to the non-moving party. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are inappropriate at the summary judgment stage. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment was not intended, nor can it be used, as a substitute for trial of issues of fact. *Emery v. Federated Foods, Inc.*, 262 Mont. 83, 92, 863 P.2d 426, 432 (1993).

### I. MCJUNKIN'S NEGLIGENCE CLAIM IS NOT BARRED BY THE MRRA.

Yeager argues that the MRRA absolves it of all liability for negligence. This argument fails on alternative grounds. As a threshold issue, the motion regarding the negligence claim should be denied as the MRRA is unconstitutional on its face and as applied. (*See* Docs. 28-29). Indeed, Yeager's argument that it is absolved of all liability based upon its

interpretation of inherent risks deprives McJunkin of the fundament right to a trial by jury, Article II, Section 26. *See Kloss v. Edward D. Jones & Co.*, 2002 MT 129, ¶¶ 53-55, 310 Mont. 123, 54 P.3d 1 (Nelson, J., specially concurring) (stating that strict scrutiny applies).

Moreover, Yeager has failed to meet its burden in demonstrating the necessity of judgment as a matter of law due to its flawed interpretation of the MRRA. The MRRA purports to limit liability for injuries that result from the "inherent risks" of participating in recreational activities. The MRRA provides, in pertinent part, that:

> (1) A person who participates in any sport or recreational opportunity assumes the inherent risks in that sport or recreational opportunity, whether those risks are known or unknown, and is legally responsible for all injury or death to the person and for all damage to the person's property that result from the inherent risks in that sport or recreational opportunity.
>
> (2) A provider is not required to eliminate, alter, or control the inherent risks within the particular sport or recreational opportunity that is provided.
>
> (3)(a) Sections 27-1-751 through 27-1-754 do not preclude an action based on the negligence of the provider if the injury, death, or damage is not the result of an inherent risk of the sport or recreational opportunity.

Mont. Code Ann. § 27-1-753. The entire statutory scheme is couched in terms of the "inherent risks" of recreational activity, which the MRRA defines as:

> "Inherent risks" means those dangers or conditions that are characteristic of, intrinsic to, or an integral part of any sport or recreational activity and **that cannot be prevented by the use of reasonable care**.

Mont. Code Ann. § 27-1-752(2) (emphasis added). This highlighted language (ignored by Yeager) should be interpreted to mean that an outfitter must still exercise reasonable care for those risks (like drowning) that can be prevented by the use of reasonable care.

A review of Montana's rules and regulations specific to outfitters demonstrates that Yeager has a duty to exercise reasonable care. *See* Mont. Admin. R. 24.171.2301 (licensees shall "provide for the health, safety, and well-being of their clients, employees, and the general public"); Mont. Admin. R. 24.171.601(1)(c) (guides must have "knowledge of equipment, terrain and hazards to competently provide a safe experience for those persons he or she guides"); Mont. Code Ann. § 37-47-402(1) (requiring an outfitter or guide offering services in Montana to "act as would a reasonably prudent member of the profession…").

Additionally, by definition, negligence is a failure to use reasonable care that results in injury. MPI 2d 2.00 Negligence – Defined (Civil 2d ed.). Yeager himself testified that it is his obligation to have knowledge of the hazards an outfitter might encounter on a river. (SDF, ¶ 48). Yeager further testified that he, as the outfitter, is in command of the raft and its

occupants. (*Id.* at ¶ 49). Therefore, this Court should conclude that Yeager owed McJunkin a duty to exercise reasonable care.

Yeager's expert argues that the MRRA exculpates Yeager from liability, simply because, in his view, any death on the river can be attributed to inherent risk. But Yeager's expert fails to address the fact that drowning is a risk that can be prevented by the use of reasonable care. *See* Mont. Code Ann. § 27-1-752(2). Indeed, McJunkin's expert witness concludes, in part, as follows:

> Outfitters and guides, be they fishing or floating, should be prepared for the inherent dangers of whitewater and should take basic steps to minimize the inherent dangers. Yeager Outfitters was aware that the Stillwater is a whitewater river, and acknowledges this when he chose to use a whitewater raft to navigate the river as opposed to his fishing drift boat: "We wouldn't put the drift boat on the Stillwater." Yeager Depo., p. 56.

(SDF, ¶ 83); (*see also id.* at ¶¶ 82-84) (detailing other violations).

Unlike skiing, in which "thrill-seeking skiers embrace its inherent dangers and risks," (*Kopeikin v. Moonlight Basin Mgmt., LLC*, 90 F. Supp. 3d 1103, 1107 (D. Mont. 2015), here McJunkin was out on a fishing trip to catch trout, not seeking the thrills of shooting the rapids of a whitewater river. And it is standard protocol amongst Montana' guides and outfitters floating Montana's rivers to be prepared to deal with a passenger being

ejected from a raft. (SDF, ¶ 83). Yeager breached these protocols. (*Id.* at ¶¶ 82-84).

The cases relied upon by Yeager fail to demonstrate the propriety of summary judgment here. For instance, Yeager relies upon *Gourneau v. Hamill*, 311 P.3d 760, ¶ 10 (Mont. 2013). (Doc. 32 at 15). The *Gourneau* case does not support a grant of summary judgment. In *Gourneau*, the plaintiff sued the Wolf Point school district and other various parties, alleging that the suicide of a troubled high school student was due to being kicked out of school after the student was devastated from not being able to participate on the wrestling team.

The Montana Supreme Court's discussion on legal duty was tied to the issue of foreseeability: "[w]ithout foreseeability of any danger of direct injury or any risk from an intervening cause, no duty exists; 'in the absence of duty, there is no negligence.'" *Gourneau*, ¶ 12 (citing *Poole ex rel. Meyer v. Poole*, 2000 MT 117, ¶ 20, 299 Mont. 435, 1 P.3d 936). The Montana Supreme Court concluded that "Wolf Point owed no legal duty because Dalton's suicide was unforeseeable by Wolf Point." *Gourneau*, ¶ 17.

In the case at bar, Yeager should have easily foreseen the risks of guiding an elderly 81-year old man in a whitewater raft on a whitewater river. Yeager testified that he had to manually place McJunkin in the boat, and that he would not allow McJunkin to wade and fish because McJunkin

"would fall." (SDF, ¶¶ 59-60, 85). Thus, Yeager should have had a basic plan for getting McJunkin to safety once he was ejected from the raft. (*Id.* at ¶¶ 82-84).

Yeager also argues that Wyoming's statutory scheme is "helpful here" because Wyo. Stat. Ann. § 1-1-123 has nearly the exact same provisions as Mont. Code Ann. § 27-1-753(1), (2), and 3(a). (Doc. 32 at 17). The statutory scheme has caused conflict in Wyoming's courts and legislature. *E.g., Cooperman v. David*, 214 F.3d 1162, 1169 (10th Cir. 2000) (stating "under Wyoming law the question of what is an inherent risk is normally a question of fact for the jury"). As noted by the *Cooperman* Court, the Wyoming legislature responded to a Wyoming Supreme Court decision by removing the underlined language from the Wyoming statute's definition of inherent risk: "any risk that is characteristic of or intrinsic to any sport or recreational opportunity <u>and which cannot reasonably be eliminated, altered, or controlled</u>." *Cooperman*, 214 F.3d at 1166, n. 3.

Moreover, Wyoming defines "inherent risk" differently than Montana. That is, Wyoming statute states that "'inherent risk' with regard to any sport or recreational opportunity means those dangers or conditions which are characteristic of, intrinsic to, or an integral part of any sport or recreational opportunity." Wyo. Stat. Ann. § 1-1-122(a)(i). Montana's definition includes language requiring that "reasonable care" be used, and,

therefore, reliance upon *Cooperman* or Wyoming's statute does not support Yeager's argument.

Yeager's comparisons to California law and Vermont law are also equally unpersuasive. For instance, in *Ferrari v. Grand Canyon Dories*, in which the plaintiff struck her head on a metal support in a raft, the court considered that the plaintiff signed a release absolving the guide of all responsibility; she was given safety instructions; was told that it was necessary to hang onto the raft when navigating rapids; and how to react if thrown out of the raft into the water. 32 Cal. App. 4th 248, 251 (Cal. App. 1995). Yeager did none of those things. (SDF, ¶¶ 78-79, 82-84).

Furthermore, in *Ferrari*, the California court stated "[i]t is generally recognized commercial operators of recreational activities 'have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport…'" 32 Cal. App. 4th at 254 (citations omitted); *see also Moser v. Ratinoff,* 105 Cal. App. 4th 1211, 1221–22, 130 Cal. Rptr. 2d 198 (2003) (concluding the primary assumption of risk rule "does not grant unbridled legal immunity to all defendants participating in sporting activity… it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport.'").

Vermont's applicable statute provides that "a person who takes part in any sport accepts as matter of law the dangers that inhere therein insofar as they are obvious and necessary." *Cernansky v. Lefebvre*, 2016 WL 7335600, at *2 (D. Vt. Dec. 16, 2016). Furthermore, "a risk is 'necessary' under the terms of the statute if the effort required to remove it would be impossible to undertake or would impose an unreasonable burden." *Id.* at *3. Indeed, "[e]vidence of common practices used to avoid a well-known hazard would tend to refute a finding that the risk was necessary." *Id.*

Here, McJunkin has presented evidence that the risk of drowning could be eliminated. (SDF, ¶¶ 82-84). McJunkin's expert witness also opined that Yeager increased the risks to McJunkin, and failed to adhere to industry standards. (SDF, ¶¶ 82-84). This is not a situation in which McJunkin was speeding down the slopes of a steep, snow-covered incline, seeking the thrill inherent in the sport. Nor was McJunkin planning on shooting the rapids of the Stillwater River. He was paying Yeager for an opportunity to catch a trout on a fly, and any risk of drowning could have easily been prevented by the use of reasonable care. Yeager recognized the risks. For instance, Yeager knew not to use a drift boat on the Stillwater River. (SDF, ¶ 85). Moreover, Yeager would not let McJunkin wade fish and fish due to his infirmities. (*Id.* at ¶ 60). But Yeager did not tell McJunkin what to do in the event he was ejected from the raft, nor did he

give McJunkin any warnings prior to hitting the rapids which ejected McJunkin. (*Id.* at ¶¶ 78-80). Thus, McJunkin has presented sufficient evidence to defeat the motion for summary judgment on the negligence claim.

Finally, Yeager argues that "there is no genuine dispute that a risk inherent to floating in a raft on a river is falling out of the raft into the water." (Doc. 32 at 21). That argument misses the mark. Falling out of the raft should not lead to death. In fact, the standard protocol in the industry is to be prepared for this scenario, and Yeager obviously was not prepared as he struggled for *nearly half a mile* to retrieve Yeager from the river. (*E.g.*, SDF, ¶ 56). Accordingly, this Court should conclude that Yeager has failed to satisfy its burden in demonstrating that it is entitled to judgment as a matter of law on McJunkin's negligence claim.

## II. MCJUNKIN'S NIED CLAIMS SURVIVE SUMMARY JUDGMENT.

Yeager argues, in part, that McJunkin's NIED claim should be dismissed due to the absence of "an actionable predicate act of negligence." (Doc. 32 at 23). Yeager leaps to the conclusion that since the MRRA absolves it of liability, then McJunkin's NIED claim fails. However, this argument is defeated since disputed issues of material fact preclude summary judgment on McJunkin's negligence claim.

Alternatively, Yeager argues that McJunkin has failed to demonstrate "serious" or "severe" emotional distress. (Doc. 32 at 23). Emotional distress includes various different mental experiences which can satisfy the severity threshold: "fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea." *Van Vallis v. Transcon. Ins. Co.*, 2008 WL 11349758, at *4 (D. Mont. Aug. 19, 2008). Serious or severe emotional distress is found in this case.

Unlike in *Renville v. Fredrickson,* 2004 MT 324, 324 Mont. 86, 101 P.3d 773, here McJunkin has presented evidence of the following: Rhett McJunkin took medications to help sleep due to the grief he was experiencing (SDF, ¶ 36); Rhett suffered from fatigue caused by sadness and sleep trouble (*id.*); Rhett had grief, anxiety, and nightmares of his father drowning (*id.*); and Rhett still suffers from grief and anxiety (*id.*). Charles McJunkin, Jr., testified similarly, indicating that his focus at work has been impacted; and that he "doesn't sleep at night a lot of nights," and that he has recurring dreams of his dad, "seeing his face in the water floating lifelessly down a river every night." (*Id.*) Moreover, both children testified that they have not gotten over the grief from their father drowning in the manner that he did. (*Id.* at ¶ 37; *see also* ¶ 38).

Therefore, since McJunkin has presented evidence of the serious and severe nature of emotional distress, the NIED claims survives. The Court's

role is not to weigh the evidence at this stage. *See Anderson,* 477 U.S. at 255. Instead, all inferences must be drawn in favor of McJunkin, and the evidence demonstrates sufficient material facts to preclude summary judgment on the NIED claim.

**III.   MCJUNKIN'S LOSS OF CONSORTIUM CLAIMS SURVIVE SUMMARY JUDGMENT.**

Montana law recognizes an independent claim for loss of consortium. *E.g., Bain v. Gleason*, 223 Mont. 442, 726 P.2d 1153 (1986). "Loss of consortium damages compensate the plaintiff for the loss of care, comfort, society and companionship of the decedent." *Adams v. United States*, 669 F. Supp. 2d 1203, 1206–07 (D. Mont. 2009).

Yeager summarily argues, in part, that McJunkin's loss of consortium claim should be dismissed due to the lack of an underlying tortious act. (Doc. 32 at 25). However, this argument fails because disputed issues of material fact preclude summary judgment on McJunkin's negligence claim.

As to Yeager's alternative argument, McJunkin has presented sufficient evidence to raise disputed issues of material fact as to the claim for loss of consortium. The Montana Supreme Court recognizes a valid loss of consortium claim by parents of an adult child. *Hern v. Safeco Insurance Company of Illinois,* 125 P.3d 597, 608 (Mont. 2005). Thus, the claim of adult children is also plausible. Nonetheless, contrary to Yeager's argument, both

Rhett and Charles testified about the tight bond with their father that is unlike any other bond imaginable:

```
1  sort of thing and just general life things, you know.
2  Things you talk to your dad about that you can't
3  really talk to other people.  Just how you struggle
4  in the world and job and all the things that you deal
5  with that's -- that was, you know, pretty typical of
6  the conversations that he and I would have.
```

(SDF, ¶ 38).

```
15  Like I say, I mean, it's not always the
16  celebration but the depravation of the ability to
17  have conversation, relationship and support that my
18  dad always provided to both my brother and I.
```

(SDF, ¶ 36). Indeed, Charles talked to his father on a regular basis. (*Id.*) Rhett also testified that he has lost the love of his father, and that his father "loved him like nobody else loves you." (*Id.*) Accordingly, there are sufficient facts to demonstrate an extraordinarily close relationship between McJunkin and his children to survive summary judgment. The motion for judgment as a matter of law on the loss of consortium claim should be denied.

## CONCLUSION

Based upon a consideration of the foregoing, this Court should deny Yeager's motion for summary judgment in its entirety. McJunkin's negligence claim survives summary judgment on alternative grounds. First, the MRRA is unconstitutional on its face and as applied. Second, even

assuming the applicability of the MRRA, Yeager had a duty to exercise reasonable care, and disputed issues of material fact preclude summary judgment. Moreover, McJunkin has presented sufficient facts for the claims of negligent infliction of emotional distress and loss of consortium to survive the summary judgment motion.

DATED this <u>5th</u> day of March 2018.

        McGrady Law

        By: <u>/s/ Philip McGrady</u>
           Philip McGrady
           Attorney for the Plaintiffs

## CERTIFICATE OF COMPLIANCE WITH L.R. 7.1

In accordance with D. Mont. L.R. 7.1(d)(2)(E), I hereby certify that the foregoing Brief in Opposition to Defendant's Motion for Summary Judgment contains <u>3,984</u> words, excluding caption, and certificates of service and compliance. In counting the number of words, I have relied on the word count of a word-processing system used to prepare the brief.

By: <u>/s/ Philip McGrady</u>
Philip McGrady

## CERTIFICATE OF SERVICE

I hereby certify that on the <u>5th</u> day of March 2018, a copy of the foregoing was filed electronically and was therefore served electronically on those persons and entities that have properly registered for such electronic service.

By: <u>/s/ Philip McGrady</u>
Philip McGrady