IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| CHARLES P. MCJUNKIN, deceased, by and through his executor and personal representative, RHETT MCJUNKIN, and RHETT MCJUNKIN, executor and personal representative, on behalf of the heirs of CHARLES P. MCJUNKIN, <br><br> Plaintiffs, <br><br> vs. <br><br> JAMES YEAGER d/b/a JIM YEAGER OUTFITTERS, <br><br> Defendant. | CV 17-12-BLG-TJC <br><br><br> **ORDER** |

Rhett McJunkin, as personal representative of the estate of Charles P.

McJunkin, and on behalf of the heirs of Charles P. McJunkin ("Plaintiffs"), brings

this action against Defendant James Yeager, doing business as Jim Yeager

Outfitters ("Yeager" or "Defendant"), in relation to a fatal boating accident that

occurred on the Stillwater River near Columbus, Montana.  Plaintiffs assert claims

for negligence, negligent infliction of emotional distress, and loss of consortium.

(Doc. 1.)

Presently before the Court are Plaintiffs' Motion to Amend the Complaint

(Doc. 23), Plaintiffs' Motion for Partial Summary Judgment Regarding the

Constitutionality of the Montana Recreation Responsibility Act (Doc. 28), and

1

Defendant's Motion for Summary Judgment (Doc. 31). The motions are fully briefed and ripe for the Court's review.

Having considered the parties' submissions, the Court finds Plaintiffs' Motion to Amend should be **DENIED**, Plaintiff's Motion for Partial Summary Judgment should be **DENIED**, and Defendants' Motion for Summary Judgment should be **GRANTED in part and DENIED in part**.

## I. FACTUAL BACKGROUND[1]

Yeager is a professional fishing guide and outfitter. On July 17, 2014, Yeager took a paying client, Charles P. McJunkin ("McJunkin"), on a guided fishing trip in a raft on the Stillwater River. As Yeager was guiding and operating the raft, McJunkin fell into the river and drowned. McJunkin was 81 years old at the time of his death.

McJunkin had gone on similar guided fishing trips with Yeager for approximately 20 years. In fact, in the week preceding the July 17, 2014 accident, McJunkin had floated and fished the Stillwater River three times with Yeager. On each occasion, Yeager put-in at the Johnson Bridge Fishing Access, and used the Swinging Bridge Fishing Access Site for a take-out at the end of the day. The

---

[1] The background facts set forth here are relevant to the Court's determination of the pending motions for summary judgment and are taken from the parties' submissions and are undisputed except where indicated.

Swinging Bridge take-out is approximately one-quarter mile above a set of rapids known as the Beartooth Drop. Yeager had never floated through the Beartooth Drop with McJunkin.

On the date of the accident, Yeager was guiding McJunkin and his partner, Julia Garner ("Garner"). The plan was to again float from Johnson Bridge to the Swinging Bridge take-out. The river conditions encountered by Yeager that day were characteristic of, and consistent with conditions he previously encountered on that stretch of the river. Yeager approached the Swinging Bridge take-out in the same manner as he had on the three earlier days of fishing. As he approached the take-out, the raft crossed an underwater shelf of rocks. When the rear of the raft passed the shelf, the boat rocked and McJunkin fell into the water. Although the raft was equipped with personal floatation devices (PFDs), McJunkin was not wearing one at the time.

McJunkin swam toward the raft, and Yeager attempted to position the raft so that McJunkin could grab ahold of the side. During this process, the party floated past the Swinging Bridge take-out. To complicate matters further, as Yeager attempted to pull McJunkin into the raft, Garner fell into the water. The parties dispute what caused Garner's fall. Plaintiffs contend Yeager accidentally hit her with an oar. Yeager indicated he didn't know what caused her to fall in, testifying "I don't know if I hit a rock or a wave or whatever, Julie went in." Garner yelled

to Yeager that she could not swim.  Yeager made the split-second decision to let go

of McJunkin and attempt to save Garner, fearing she would drown otherwise.

Yeager was able to pull her back into the raft as they entered the Beartooth Drop.

Meanwhile, McJunkin lost contact with Yeager and the raft and floated through the

rapid.  He ultimately did not survive.

## II.      LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where the moving party demonstrates the

absence of a genuine issue of material fact and entitlement to judgment as a matter

of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986).  Material facts are those which may affect the outcome of the case.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute as to a

material fact is genuine if there is sufficient evidence for a reasonable fact-finder to

return a verdict for the nonmoving party.  *Id*.  "Disputes over irrelevant or

unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec.*

*Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The party seeking summary judgment always bears the initial burden of

establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at

323.  The moving party can satisfy this burden in two ways: (1) by presenting

evidence that negates an essential element of the nonmoving party's case; or (2) by

demonstrating that the nonmoving party failed to make a showing sufficient to

establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322-23. If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The opposing party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 252).

/ / /

/ / /

# III.  DISCUSSION

## A.  Cross-Motions for Summary Judgment Related to the Montana Recreation Responsibility Act

Plaintiffs assert Yeager's negligence caused McJunkin's death.  Yeager contends Plaintiffs' negligence claim fails as a matter of law because it is barred by Montana's Recreation Responsibility Act (the "MRRA"), Mont. Code Ann. § 27-1-751, et seq.  Thus, Yeager argues summary judgment on the negligence claim is warranted.

Plaintiffs counter that the MRRA is unconstitutionally vague, and violates the constitutional guarantee of equal protection and right to full legal redress.  Plaintiffs, therefore, move for partial summary judgment declaring the MRRA unconstitutional.  Plaintiffs further assert that even if the MRRA is constitutional, there are genuine issues of material fact which preclude summary judgment.

### 1.  Yeager's Motion for Summary Judgment under the MRRA

The MRRA limits the liability of recreational opportunity providers for injuries resulting from the inherent risks of sports or recreational opportunities.[2]  Specifically, the MRRA provides in relevant part:

---

[2] "Sport or recreational opportunity" is defined broadly in the MRRA as "any sporting activity, whether undertaken with or without permission, include but not limited to baseball, softball, football, soccer, basketball, bicycling, hiking, swimming, boating, hockey, dude ranching, nordic or alpine skiing, snowboarding, snow sliding, mountain climbing, river floating, whitewater rafting, canoeing, kayaking, target shooting, hunting, fishing, backcountry trips, horseback riding and

(1) A person who participates in any sport or recreational opportunity assumes the inherent risks in that sport or recreational opportunity, whether those risks are known or unknown, and is legally responsible for all injury or death to the person and for all damage to the person's property that result from the inherent risks in that sport or recreational opportunity.

(2) A provider is not required to eliminate, alter, or control the inherent risks within the particular sport or recreational opportunity that is provided.

(3)(a) Sections 27-1-751 through 27-1-754 do not preclude an action based on the negligence of the provider if the injury, death, or damage is not the result of an inherent risk of the sport or recreational opportunity.

Mont. Code. Ann. § 27-1-753.

The MRRA defines "Inherent risks" as:

[T]hose dangers or conditions that are characteristic of, intrinsic to, or an integral part of any sport or recreational activity and that cannot be prevented by the use of reasonable care.

Mont. Code Ann. § 27-1-752(2).

When interpreting a statute, a court is required to look to the plain meaning of the words. *Clarke v. Massey*, 897 P.2d 1085, 1088 (1995). A court will only resort to the legislative history of a statute if the legislative intent cannot be

---

other equine activity, snowmobiling, off-highway vehicle use, agritourism, an on-farm educational opportunity, and any similar recreational activity." Mont. Code. Ann. § 27-1-752(4).

determined from the statute's plain wording. *Id.* "[T]he office of judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Mont. Code Ann. § 1-2-101.

Yeager maintains that the statute has a simple, straight-forward application to the facts of this case. He argues McJunkin's death was caused by drowning; falling out of a boat and drowning is an inherent risk of fishing from a raft; therefore, Plaintiffs' negligence claim is barred under the MRRA as a matter of law. In short, Yeager asserts because the injury in this case involved drowning while fishing from a raft, the MRRA precludes Plaintiffs' claim. (Doc. 32 at 15.)

Yeager reads the MRRA much too broadly. Construing the statute in this fashion would immunize providers of recreational activities from their own negligence. The Court finds that such a construction would be contrary to the statute's plain words, the legislative intent in enacting the legislation, and would likely render the MRRA unconstitutional.

Under the plain language of the MRRA, a risk must satisfy two requirements to constitute an "inherent risk" and thus fall within the Act's protection. There must be (1) a danger or condition that is characteristic of, or intrinsic to the activity, and (2) the danger or condition must be one that cannot be prevented by the use of reasonable care. Mont. Code Ann. § 27-1-752(2). Therefore, the

8

MRRA does not insulate a provider from all risks which are characteristic of, or intrinsic to the activity. It only provides protection for those risks which cannot be prevented with the use of reasonable care. In order to make this determination, it is necessary to look at the facts and circumstances of each case and the specific risk or condition involved.

Wyoming has a similar "Recreation Safety Act." Wyo. Stat. Ann. §§ 1-1-121 through 1-1-123. Like the MRRA, the Wyoming Act provides that "[a]ny person who takes part in any sport or recreational opportunity assumes the inherent risk in that sport or recreational opportunity, whether those risks are known or unknown . . . ." Wyo. Stat. Ann. § 1-1-123(a). It also similarly states that a provider of the "recreational opportunity is not required to eliminate, alter, or control the inherent risks" of the activity. Wyo. Stat. Ann. § 1-1-123(b). One critical difference between the two acts, however, is the definition of an inherent risk. The MRRA and the Wyoming Act both define inherent risk to mean "those dangers or conditions which are characteristic of, intrinsic to, or an integral part" of the activity. Wyo. Stat. Ann. § 1-1-122(a)(i). But the Wyoming Act's definition does not also include the MRRA's requirement that the risk "cannot be prevented by the use of reasonable care."

Nevertheless, the construction of the Wyoming Act is instructive as far as the similarities go. Courts which have construed and applied the Wyoming statute

have rejected the broad, general interpretation advanced by Yeager in this case. To determine what risks are inherent, decisions under the Wyoming Act have consistently required that a court "go beyond a broad characterization and inquire into the specific circumstances of both [the plaintiff's] actions and those of the recreation provider." *Creel v. L & L, Inc.,* 287 P.3d 729, 736 (Wyo. 2012).

In *Cooperman v. David*, 214 F.3d 1162 (10th Cir. 2000), for example, the plaintiff was injured during a guided horseback trail ride. The injury occurred when the plaintiff's saddle slipped around to the belly of the horse, causing the plaintiff to fall to the ground. The defendant moved for summary judgment under the Wyoming Recreation Safety Act, arguing that a slipping saddle is an inherent risk of horseback riding. In determining the application of the Act, the Tenth Circuit made clear that the risk in question must be not be evaluated broadly or generally, but in the context of the specific factual setting presented.

> Horseback riding undoubtedly carries some inherent risk that the rider will fall off the horse and get injured. A horse could stumble on an uneven path, or rear, or simply begin to gallop for no apparent reason. All of these risks clearly would qualify as inherent risks of horseback riding. Simply because some risks are inherent in horseback riding, however, does not mean that all risks of falling from a horse are necessarily inherent; instead, it is necessary to look factually at the specific risk to which the rider was exposed. When attempting to determine whether a risk is inherent to a sport, we can not look at the risk in a vacuum, apart from the factual setting to which the rider was exposed. And, we must evaluate the risk at the greatest level of specificity permitted by the factual record. See *Madsen*, 31 F.Supp.2d at 1328 ("The Court believes that one must look to the specific facts of a case to see whether there is a duty, and not simply look to the abstract character of the risk.").

*Cooperman*, 214 F.3d at 1167.

The same evaluation must be conducted under the MRRA. It is not enough to find that falling out of a boat and drowning is a general risk of fishing from a raft; therefore, drowning is an inherent risk in fishing. Although there may be circumstances where the risk of drowning cannot be prevented with the use of reasonable care, it is undoubtedly true the risk may be prevented in many other circumstances.

Therefore, each case must be examined in light of the specific factual context of the case to determine whether the specific risk involved could have been prevented using reasonable care. As the Wyoming Supreme Court points out, "[s]ome risks may occur from the choices a recreation provider makes on behalf of the participant and from the conditions in which the recreational opportunity is provided. Thus, atypical or uncharacteristic risks can arise even in those specific sports the Wyoming legislature clearly intended to exempt from liability for inherent risks." *Dunbar v. Jackson Hole Mtn. Resort Corp.*, 392 F.3d 1145, 1148–49 (10th Cir.2004).

In addition, Yeager's broad interpretation of the MRRA would effectively immunize providers of a recreational opportunity from their own negligence. If providers were protected from all fishing-related drownings under the MRRA, they would be relieved of liability where the death was caused by negligence, or even

by willful or wanton misconduct.  For example, it would apply not only to situations where a participant falls out of a raft and drowns without negligent conduct by the provider; it would also apply where the provider negligently causes a raft to collide with a bridge abutment or other known obstruction in the river.

Such an application would be contrary to the legislative intent of the MRRA, which expressly provides that the Act does not "preclude an action based on the negligence of the provider. . . ."  Mont. Code Ann. § 27-1-753.  As recognized under the Wyoming Act, the "intent behind the Recreation Safety Act was not to preclude parties from suing for a provider's negligence, it was merely to stop people from suing providers for those risks that were inherent to a sport."  *Madsen v. Wyoming River Trips*, 31 F.Supp.2d 1321, 1328 (D. Wyo. 1999).

Finally, construing the MRRA as Yeager urges would likely render the Act unconstitutional.  Statutes should be construed "to avoid an unconstitutional interpretation if possible."  *Hernandez v. Bd. of Cty. Comm'rs*, 189 P.3d 638, 642 (Mont. 2008).  The Montana Supreme Court found a prior version of Montana's Skier Responsibility Act unconstitutional because it prohibited a skier "from obtaining legal recourse against an operator even if the injury is proximately caused by the negligent or even intentional actions of the operator."[3]  *Brewer v.*

---

[3] The statute at issue in *Brewer* barred recovery from a ski area operator if the skier suffered an injury resulting "from participating in the sport of skiing."  *Brewer*, 762 P.2d at 229 (citing Mont. Code Ann. § 23-2-736(1)).

*Ski-Lift, Inc.*, 762 P.2d 226, 230 (Mont. 1988). The Court found that although the state had a legitimate interest in protecting the economic vitality of the ski industry, there was no rational relationship between that purpose and requiring that skiers assume all risks for injuries regardless of the presence of negligence by the ski area operator. *Id.* at 230. *See also, Oberson v. U.S. Dept. of Ag., Forest Serv.*, 171 P.3d 715 (Mont. 2007) (snowmobile liability statute's gross negligence standard, which relieved snowmobile operators from their negligent conduct, violated equal protection).

The purpose of the MRRA is substantially the same as the skier and snowmobile liability statutes – protection of providers of recreational activities from liability for risks over which the provider has no control. Under Yeager's interpretation of the MRRA, providers of float fly fishing would be immune from liability for drownings, even when caused by the provider's own negligence. Under *Brewer* and *Oberson*, such a construction would violate Plaintiffs' rights to equal protection, due process, and access to the courts.

Therefore, whether the MRRA protects a provider of recreational opportunities from certain risks cannot be determined by looking at the broad, abstract character of the risk. Instead, the specific facts and circumstances in each case must be examined to determine whether the risk involved can be prevented by

the use of reasonable care.  If so, the MRRA does not shield the provider from liability.

That being established, the determination of whether McJunkin's drowning resulted from an inherent risk of floating and fly fishing is not appropriate for summary judgment.  While there may be cases where there are no genuine issue of material fact, and the issue may be appropriately decided as a matter of law, the determination of whether a risk is an inherent risk is generally a factual determination for the jury to decide.  *See e.g. Mead v. M.S.B., Inc.*, 872 P.2d 782, 788-89 (Mont. 1994) (holding whether an inherent risk had been established under the Skier Responsibility Act was a question of fact to be resolved by the trier of fact); *Cooperman*, 214 F.3d at 1169 (noting the question of what is an inherent risk is normally a question of fact for the jury); *Halpren v. Wheeldon*, 890 P.2d 562, 566 (Wyo. 1995) ("when genuine issues of material fact exist, it is proper to present the issue to the jury of whether a risk is inherent to a particular activity.").[4]

Here, there are genuine issues of material fact regarding whether the risk encountered by McJunkin was an inherent risk to the sport of float fishing, or

---

[4]  At the time the *Halpren* case was decided, the Wyoming Act's definition of inherent risk was similar to the MRRA.  It was defined as "any risk that is characteristic of or intrinsic to any sport or recreational opportunity *and which cannot reasonably be eliminated, altered or controlled*."  *Halpren*, 890 P.2d at 564.  The highlighted portion of the definition was subsequently removed by the Wyoming legislature.

whether Yeager could have prevented the risk using reasonable care. Yeager's expert opined that drowning is an inherent risk of floating in a raft on a river, and McJunkin's death was a result of that inherent risk. But Plaintiffs' expert states the risk of drowning can be prevented by the use of reasonable care. Plaintiffs' expert also opined that Yeager increased the risks to McJunkin, and failed to adhere to industry standards by not taking basic safety precautions and not having a plan or equipment to retrieve McJunkin from the water.

Accordingly, the Court finds there are genuine issues of material fact regarding whether the risks encountered by McJunkin could have been prevented by the use of reasonable care.

As such, Yeager's Motion for Summary Judgment is DENIED as to Count I of the Complaint.

### 2. Plaintiffs' Motion for Summary Judgment

McJunkin challenges the constitutionality of the MRRA on due process and equal protection grounds. Statutes are presumed to be constitutional, and "the party challenging the constitutionality of a statute bears the burden of proving the statute unconstitutional beyond a reasonable doubt." *Globe v. Montana State Fund*, 325 P.3d 1211, 1216 (Mont. 2014). "'The question of constitutionality is not whether it is possible to condemn, but whether it is possible to uphold the legislative action . . . .'" *Davis v. Union Pac. R. Co.*, 937 P.2d 27, 31 (1997)

(quoting *Fallon County v. State* 753 P.3d 338, 340 (Mont. 1988). "[E]very possible presumption must be indulged in favor of the constitutionality of the Act." *Id.* Thus, courts "will construe a statute to further, rather than to frustrate, the Legislature's intent according to the plain meaning of the statute's language." *In re Custody and Parental Rights of D.S.*, 122 P.3d 1239, 1243 (Mont. 2005). *See also Hernandez*, 189 P.3d at 642 (stating it is the court's duty "to avoid an unconstitutional interpretation if possible").

### a. The MRRA is not Unconstitutionally Vague

Plaintiffs argue the MRRA is unconstitutionally vague on its face, and as applied. Plaintiffs contend the MRRA purports to limit liability for injuries that result from inherent risks, but it does not define "inherent risk" in any clear manner. Thus, Plaintiffs argue there is no fair way to apply the statute because it is unclear what constitutes an "inherent risk."

The void-for-vagueness doctrine chiefly applies to criminal statutes, but can apply to civil laws as well. Civil statutes, however, generally receive less exacting vagueness scrutiny. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498-99 (1982). The United States Supreme Court has held "[t]o find a civil statute void for vagueness, the statute must be so vague and indefinite as really to be no rule or standard at all." *Boutilier v. INS*, 387 U.S. 118, 1234 (1967). The Montana Supreme Court has similarly declared that a statute is

16

unconstitutionally vague on its face only if it is shown "that the statute is vague 'in the sense that no standard of conduct is specified at all.'" *In re Custody*, 122 P.3d 1239, 1243 (Mont. 2005). "[P]erfect clarity and precise guidance are not required." *Id.* A statute is not vague "simply because it can be dissected or subject to different interpretations." *Montana Media, Inc. v. Flathead Cty.*, 63 P.3d 1129, 1140 (Mont. 2003).

Here, the Court finds the MRRA is not unconstitutionally vague on its face. Section 27-1-752(2) plainly provides a standard for assessing what constitutes an "inherent risk." The standard is established with common, readily-understood terms, and it incorporates the familiar negligence standard of reasonable care. Mont. Code Ann. § 27-1-752(2).

Further, contrary to Plaintiffs' argument, the fact the MRRA does not specifically enumerate the risks inherent in each of the 30 recreational activities listed in the statute does not make the Act unconstitutional. The Montana Supreme Court has recognized that even if a term in a statute is not exhaustively defined, and allows the court some discretion in determining whether the evidence presented satisfies the statute, the statute will not be rendered unconstitutionally vague. *See In re Custody*, 122 P.3d at 1243 (holding that although § 41-3-423(2)(a) did not contain an exhaustive list of conduct that constitutes the term "aggravated circumstances," the statute was not void for vagueness). Moreover,

even the more specific recreational liability statutes that Plaintiffs uses for comparison, provide non-exclusive lists of inherent risks. *See e.g.* Mont. Code Ann. § 23-2-702(2) ("'Inherent dangers and risks of skiing' means those dangers or conditions that are part of the sport of skiing, *including*: . . ."); §23-2-822(2) ("Risks inherent in the sport of off-highway vehicle operation *include* . . ."); § 27-1-726(7) ("'Risks inherent in equine activities' means dangers or conditions that are an integral part of equine activities, *including but not limited to*: . . .").

The Court further finds the MRRA is not unconstitutionally vague as applied. A person of common intelligence can understand the risks associated with river sports or activities. There is no indication McJunkin would not have been able to appreciate such risks, including the potential risk involved in floating and fishing. Indeed, in their depositions Plaintiffs were able to articulate risks associated with floating on a river, such as falling out of the boat and drowning. Therefore, McJunkin could have understood that the MRRA may limit Yeager's liability for accidents on the river.

Accordingly, the Court finds the MRRA is not void for vagueness.

/ / /

/ / /

/ / /

/ / /

b.     <u>The MRRA Does Not Violate the Constitutional</u>
<u>Guarantee of Equal Protection</u>

Plaintiffs also argue the MRRA violates the constitutional guarantee of equal protection in two ways. First, Plaintiffs assert the Act eliminates any theory of negligence on the part of recreational providers, essentially excusing them from the consequences of their own negligence. Second, Plaintiffs argue the MRRA arbitrarily treats certain groups of recreationalists differently. Plaintiffs assert that participants in activities covered by the MRRA are treated differently from those participating in activities covered under other activity-specific recreation statutes because the MRRA is vague, whereas the other statutes are not. Plaintiffs further assert the MRRA treats recreationists covered by the Act differently because the MRRA attempts to resurrect the "secondary" assumption of risk defense, and inserts a "primary" assumption of risk defense.

i.     *The MRRA Does not Eliminate All Theories of*
*Negligence*

As discussed above, although a provider is not liable for, or required to eliminate, alter, or control inherent risks under the MRRA, the provider still owes a duty of care for risks that can be prevented by the use of reasonable care. Thus, the Court finds the MRRA continues to permit negligence claims against a provider if the risk could have been prevented by the use of reasonable care. Thus, the MRRA

does not violate Plaintiffs' equal protection rights by immunizing providers from their own negligence.

        ii.     *The MRRA Does Not Arbitrarily Treat Groups of Recreationists Differently*

The MRRA is drawn broadly and defines "sport or recreational opportunity" by reference to a non-exhaustive list of 30 activities. Mont. Code. Ann. § 27-1-752(4). Some of the listed activities are also covered by their own activity-specific recreation liability statutes, such as skiing, snowmobiling and off-road vehicle use. *Id.*; §§ 23-2-651, et seq.; 23-2-702, et seq.; 23-2-822. Therefore, the MRRA goes on to exclude those activities from its scope. Mont. Code Ann § 27-1-754 (stating the MRRA does "not apply to duties, responsibilities, liability, or immunity related to" activities that are already subject to an activity-specific recreational statute).

Plaintiffs assert that this statutory scheme causes different groups of recreationists to be treated differently. Specifically, Plaintiffs assert the recreationists who fall under the MRRA are disadvantaged in several respects.

First, Plaintiffs argue the MRRA's alleged vagueness only affects the subset of recreationists who participate in activities covered by the Act. Whereas, recreationists engaging in other sports, such as skiing or snowmobiling, have specific notice of their rights and the provider's responsibilities. The Court has determined, however, that the MRRA is not unconstitutionally vague. Further, as noted above, even the activity-specific recreation statutes that specifically identify

certain inherent risks do so in a non-exhaustive fashion.  Thus, there is no

significant difference in treatment between the recreationists who fall under the

MRRA, and those who fall under other recreational statutes with respect to notice.

Next, Plaintiffs assert the MRRA departs from other recreational statutes by

attempting to revive the "secondary" assumption of risk defense and by suggesting

a "primary" assumption of risk defense.  Historically, Montana has not used the

terms "primary" and "secondary" assumption of risk.  Nevertheless, legal

commentators have explained "primary" assumption of risk refers to the concept of

duty, and "secondary" assumption of risk refers to contributory negligence.  *See*

Dan B. Dobbs, et al., *Dobbs' Law of Torts* § 238 (2d ed. 2018) ("[T]he term

'primary assumption of risk' is used to indicate the no-duty or no-breach

conception and its attendant complete-bar effect; and the term 'secondary

assumption of risk' is used to indicate the contributory negligence conception.");

65A C.J.S. Negligence § 398 (2018) ("Primary assumption of risk limits the duty

which a person owes to another.  Secondary assumption of risk, on the other hand,

which is a type of contributory negligence and is an affirmative defense, may be

raised by the defendant after the plaintiff has met the burden of showing that the

defendant breached a legal duty owed to the plaintiff."); W. Page Keeton, et al.,

*Prosser and Keeton on the Law of Torts* § 68, 480-81 (5th Ed. 1984) (stating

"primary" assumption of risk "is really a principle of no duty," and explaining that

under the duty perspective, "the plaintiff voluntarily enters into some relation with the defendant, with knowledge that the defendant will not protect him against one or more future risks that may arise from the relation . . . the legal result is that the defendant is simply relieved of the duty which would otherwise exist.").

With regard to "secondary" assumption of risk, Plaintiffs assert the MRRA, "unlike any other recreation act in Montana," resurrects the "secondary" assumption of risk defense, without articulating any specific inherent risks the participant would be assuming. (Doc. 29 at 15.) As Yeager points out, however, the MRRA is in fact similar to the other recreation statutes in that they also provide that the participant assumes the risks inherent in the particular activity. *See e.g.* Mont. Code Ann. § 23-2-736(4) ("A skier shall accept all legal responsibility for injury or damage of any kind to the extent that the injury or damage results from inherent dangers and risks of skiing."); § 23-2-822 (1) ("An off-highway vehicle operator shall accept all legal responsibility for injury or damage of any kind to the extent that the injury or damage results from risks inherent in the sport of off-highway vehicle use. . . ."); 23-2-654(3) ("A snowmobiler shall accept all legal responsibility for injury or damage of any kind to the extent that the injury or damage results from risks inherent in the sport of snowmobiling."). Further, as discussed in regard to Plaintiff's vagueness challenge, the MRRA does not fail to put participants on notice of the inherent risks they are assuming. As such,

recreationists participating in activities that fall under the MRRA are not on significantly different legal footing than participants in other recreational activities.

Finally, Plaintiffs contend the MRRA's suggestion of a "primary" assumption of risk defense amounts to an end-run around comparative negligence. As used here, the assumption of risk terminology in the MRRA refers to a principle of no duty. In *Halpern v. Wheeldon*, 890 P.2d 562, 565 (Wyo. 1995), the Wyoming Supreme Court found the assumption of risk language in the Wyoming Recreation Safety Act, "was intended to limit the duty to which a provider owes to a participant." The Court explained that because primary assumption of risk was only intended to limit the provider's duty, it did not affect the comparative negligence scheme. *Id.* Likewise, here, the Court finds the assumption of risk language in the MRRA affects only the provider's duty. It does not revive contributory negligence or undermine Montana's comparative negligence law. Moreover, as noted, the other activity-specific recreation statutes contain similar assumption of risk language. Thus, recreationists are treated the same under both the MRRA and other activity-specific recreation statutes, and there is no violation of equal protection.

c. <u>The MRRA Does Not Unconstitutionally Interfere With the Right to Trial by Jury</u>

Finally, Plaintiffs argue the MRRA infringes upon the province of the jury by injecting questions of ultimate fact into preliminary legal questions. As

discussed above, however, whether McJunkin's death was the result of an inherent risk of float fly fishing, and whether it could have been prevented by the use of reasonable care, are jury questions. Thus, the Court finds the MRRA does not unconstitutionally interfere with Plaintiffs' fundamental right to trial by jury.

### B. Yeager's Motion for Summary Judgment on Plaintiffs' Negligent Infliction of Emotional Distress Claim

Yeager contends Plaintiffs' claim for negligent infliction of emotional distress ("NEID") fails as a matter of law because there is insufficient evidence for a jury to find Plaintiffs suffered serious or severe emotional distress.[5] The Court agrees.

Under Montana law, an independent cause of action for NIED arises "under circumstances where serious or severe emotional distress to the plaintiff was the reasonably foreseeable consequence of the defendant's negligent act or omission." *Sacco v. High Country Ind. Press, Inc.*, 896 P.2d 411, 426 (Mont. 1995). "To constitute 'serious' or 'severe,' the emotional distress must be 'so severe no reasonable person could be expected to endure it.'" *Feller v. First Interstate Bancsystem, Inc.*, 299 P.3d 338, 344 (Mont. 2013). The question of whether the

---

[5] Yeager also asserts Plaintiffs' NIED claim fails because there is no actionable predicate act of negligence since the MRRA bars Plaintiffs' negligence claim. As discussed, however, the Court has found there are disputed issues of material fact regarding Plaintiff's negligence claim. Accordingly, Yeager's argument fails in this regard.

threshold level of emotional distress can be found is for the Court to determine. *Sacco*, 896 P.2d at 425 ("It is for the court to determine whether on the evidence severe [serious] emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed.") (*quoting* Restatement (Second) of Torts, § 46, comment j at 78).

In *Feller*, the Montana Supreme Court considered several factors in determining whether there is sufficient evidence of severe emotional distress, including: (1) whether the plaintiff had any physical manifestations of grief; (2) whether counseling was sought or recommended; (3) whether the plaintiff took medication or the use of medication dramatically increased; (4) whether the plaintiff had continuous nights of sleeplessness or days without appetite; (5) whether the plaintiff maintained close relationships with family members and friends; (6) the duration of the emotional distress; and (7) the circumstances under which the infliction incurred, including whether the plaintiff witnessed the distressing event. *Feller*, 299 P.3d at 345.

Here, the Court finds Plaintiffs have not presented evidence of the type of emotional distress necessary to demonstrate serious or severe compensable emotional distress. Rhett McJunkin and Charles McJunkin, Jr. testified at deposition that they have both experienced grief, trouble sleeping and have had nightmares. Rhett McJunkin also testified he took sleep medication approximately

one year after the accident, but could not recall what the medication was, who prescribed the medication, or how long own long it was taken. Rhett McJunkin also stated he has also experienced "angst" and "anxiety," and Charles McJunkin, Jr. indicated his focus has been affected.

Nevertheless, there is no indication of any physical manifestation of grief, and neither has sought counseling, taken or increased medication to manage their emotional distress, have suffered a loss of appetite, are unable to maintain close family relationships, and neither witnessed the accident. The Court finds that consideration of the *Feller* factors does not lead to the conclusion that Plaintiffs' emotional distress rises to the level where severe emotional distress may be found.

The Court certainly sympathizes with Plaintiffs' grief for their loss of their father. Nevertheless, their testimony does not show their emotional distress was so severe that "no reasonable person could be expected to endure it." *Feller*, 299 P.3d at 344.

Accordingly, Yeager's Motion for Summary Judgment is GRANTED on Count II of the Complaint.

/ / /

/ / /

/ / /

/ / /

**C.     Yeager's Motion for Summary Judgment on Plaintiffs' Loss of Consortium Claim**

Yeager argues Plaintiffs' loss of consortium claim also fails as a matter of law because there is insufficient evidence to support the claim.[6]  The Court finds there are disputed issues of material fact that preclude summary judgment.

Montana law recognizes loss of consortium claims by an adult child of an injured parent.  *N. Pac. Ins. Co. v. Stucky*, 338 P.3d 56, 61 (Mont. 2014).  In *Stucky*, the Montana Supreme Court held an adult child must meet the following two-part test[7] to establish a claim for loss of parental consortium: "1) a third party tortuously caused the parent to suffer a serious, permanent and disabling mental or physical injury compensable under Montana law; and 2) the parent's ultimate condition of mental or physical impairment was so overwhelming and severe that it has caused the parent-child relationship to be destroyed or nearly destroyed."  *Id.* at 66.

---

[6] Yeager again asserts Plaintiffs' loss of consortium claim fails because there is no actionable predicate act of negligence. As discussed, this argument is again rejected because there are disputed issues of material fact regarding Plaintiffs' negligence claim.

[7] The Court adopted the two-part test from *Keele v. St. Vincent Hosp. & Health Care Ctr.*, 852 P.2d 574 (Mont. 1993), which recognized parental loss of consortium claims by minor children.  The Montana Supreme Court stated it found no reason to adopt a different standard for an adult child's claim of loss of parental consortium.  *Stucky*, 338 P.3d at 65.  The Court specifically rejected adopting the more stringent "extraordinarily close and interdependent relationship" test from *Hern v. Safeco Ins. Co. of Ill.*, 125 P.3d 597 (Mont. 2005), which applies to loss of consortium claims brought by the parent of an adult child.

In establishing a loss of parental consortium claim, the plaintiff may present evidence of the following factors, which the jury may consider in determining both whether the two-part test has been satisfied, and what damages are appropriate: "the severity of injury to the parent; the actual effect the parent's injury has had on the relationship and is likely to have in the future; the child's age; the nature of the child's relationship with the parent; and the child's emotional, physical and geographic characteristics." *Id.*

*Stucky* involved an injury to a parent, rather than the death of a parent. Nevertheless, an adult child's loss of a parent would readily meet the requirements established in Stucky for the maintenance of a consortium claim. The fact McJunkin died is sufficient to establish the first prong of the test, which requires serious permanent injury. Second, death is obviously an injury so "overwhelming and severe" as to destroy the parent-child relationship. Thus, the second prong of the test is clearly established.

Yeager points out that Plaintiffs are in their late 50's/early 60's, they lived hundreds of miles away from their father, received no financial support from him, and saw him only occasionally. Plaintiffs counter that they had a tight bond with their father, and that Charles McJunkin, Jr. talked to his father on a regular basis. This is evidence for the jury to assess. *Stucky*, 338 P.3d at 65.

Accordingly, the Court finds there are disputed issues of material fact that preclude summary judgment on Plaintiffs' loss of consortium claim. Yeager's Motion for Summary Judgment as to Count III of the Complaint is therefore, DENIED.

## III. MOTION TO AMEND COMPLAINT

Plaintiffs have also filed a Motion to Amend the Complaint. (Doc. 23.) Plaintiffs seek to add a new theory of liability to the existing negligence claim. In particular, Plaintiffs seek to add the theory of strict liability based upon an abnormally dangerous activity. Yeager opposes the motion, arguing Plaintiffs were not diligent in moving to amend, and the proposed amendment is futile.

On June 1, 2017, the Court issued a Scheduling order setting the deadline to amend pleadings for July 3, 2017. (Doc. 20.) Plaintiffs filed the instant motion seeking leave to amend on November 29, 2017. (Doc. 23.)

In situations where the deadline for amendments to pleadings has passed, a party must show good cause for not seeking leave to amend within the Court's scheduling order. Fed.R.Civ.P. 16(b)(4) ("[a] schedule may only be modified for good cause and with the judge's consent"); *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000).

In *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992), the Ninth Circuit explained that "[u]nlike Rule 15(a)'s liberal amendment

policy which focuses on the bad faith of the party seeking to interpose an amendment and the prejudice to the opposing party, Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment." Good cause to excuse noncompliance with the scheduling order exists if the pretrial schedule "cannot reasonably be met despite the diligence of the party seeking the extension." *Id.* (quoting Fed. R. Civ. P. 16 Advisory Committee's Notes (1983 Amendment)).

Prejudice to the opposing party may provide an additional reason to deny a motion to amend, but "the focus of the inquiry is upon the moving party's reasons for seeking modification." *Id*. at 609. "If that party was not diligent, the inquiry should end." *Id*.; *see also In re Western States Wholesale Natural Gas Antitrust Litigation*, 715 F.3d 716, 737 (9th Cir. 2013) (upholding denial of motion to amend where "the party seeking to modify the scheduling order has been aware of the facts and theories supporting amendment since the inception of the action").

If good cause exists for seeking amendment after the scheduling order's deadline, the Court then turns to Rule 15(a) to determine whether amendment should be allowed. "Although Federal Rule of Civil Procedure 15(a) provides that leave to amend 'shall be freely given when justice so requires,' it 'is not to be granted automatically.'" *In re Western States*, 15 F.3d at 738 (quoting *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir.1990)). Under Rule 15(a), the Ninth

Circuit directs that courts consider the following five factors to assess whether to grant leave to amend: "(1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment; and (5) whether plaintiff has previously amended his complaint." *Id.* Each of these factors is not given equal weight, however. "Futility of amendment can, by itself, justify the denial of a motion for leave to amend." *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995).

### A.      Lack of Diligence

As noted above, Plaintiffs seek to amend the Complaint to include an additional theory of strict liability. The Court finds that Plaintiffs did not act diligently in seeking to amend the Complaint. The motion to amend was filed nearly five months after the Court's deadline to amend pleadings. Plaintiffs' explanation for the delay is that the additional theory of liability is premised upon Yeager's expert report, which they did not receive until November 13, 2017.

The Court finds, however, that Plaintiffs were aware of the facts and theories supporting the amendment long prior to receipt of Yeager's expert report. The expert report did not provide any new facts, but rather offered opinion evidence that fly fishing from a raft is inherently dangerous, and that the danger cannot be eliminated by reasonable precautions. But Plaintiffs have been aware that Yeager intended to raise an inherent risk defense since Yeager filed his answer on March 6, 2017, and raised the MRRA as an affirmative defense. (Doc. 4 at 7.) Yeager

also filed a Preliminary Pretrial Statement approximately six months before the expert report was produced that put Plaintiffs on further notice of this theory of defense. (*See* Doc. 18 at 6) (stating that "[f]alling out of a raft on a river is a danger that cannot be prevented by the use of reasonable care.") Therefore, Plaintiffs' argument that they did not possess information supporting the abnormally dangerous activity theory of liability until after they received the expert report is not persuasive. *See Bonin*, 59 F.3d at 845 (holding a motion to amend may be denied "where the movant presents no new facts but only new theories and provides no satisfactory explanation for his failure to fully develop his contentions originally").

## B.    Futility of Amendment

Even if the Court found "good cause," under Rule 16, application of the Rule 15 factors dictate denial of the motion to amend. Although there is no indication Plaintiffs are acting in bad faith, or that amendment would unduly prejudice Yeager, the Court has found undue delay. Moreover, the Court finds the amendment would be futile.

In seeking to impose strict liability, Plaintiffs conflate the concept of inherent risk with an abnormally dangerous activity. The activity at issue here – fly fishing from a raft – is not the kind of activity that has been recognized as abnormally dangerous. Simply because an activity has inherent risks, does not

mean the activity is abnormally dangerous for purposes of strict liability. A comparison of activities that are considered abnormally dangerous illustrates the point. *See e.g. Beckman v. Butte-Silver Bow Cty.*, 1 P.3d 348 (Mont. 2000) (trenching); *Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 165 P.3d 1079 (Mont. 2007) (operating a gas refinery near residences and a school); *Ulmen v. Schwieger*, 12 P.2d 856 (Mont. 1932) (highway construction); and *Stepanek v. Kober Const.*, 625 P.2d 51 (Mont. 1981) (construction scaffolding). The Court does not find the characteristics and risks of fly fishing equate in any meaningful way with these types of activities.[8]

"Whether an activity is abnormally dangerous is a question of law." *Chambers v. City of Helena*, 49 P.3d 587, 591 (Mont. 2002), *overruled on other grounds, Giambra v. Kelsey*, 162 P.3d 134 (Mont. 2007). No court has held float fly fishing is an abnormally dangerous activity, and this Court declines Plaintiffs' invitation to be the first to do so.

---

[8] Likewise, the Restatement (Second) of Torts § 519, which has been adopted by the Montana Supreme Court, identifies the following as abnormally dangerous activities: "Water collected in quantity in unsuitable or dangerous place," "Explosives in quantity in a dangerous place," "Inflammable liquids in quantity in the midst of a city," "Blasting, in the midst of a city," "Pile driving, with abnormal risk to surroundings," "Release into air of poisonous gas or dust," "Drilling oil wells or operating refineries in thickly settled communities," and "production of atomic energy." Again, these activities are of a wholly different nature than float fly fishing.

In addition, the Court has determined the MRRA is constitutional and applies to Plaintiff's negligence claim. The MRRA limits a recreational provider's liability. Mont. Code Ann. § 27-1-7532(3); 27-1-753. The Montana Legislature enacted the MRRA to protect recreational providers from liability for injuries that are caused by the very characteristics of a particular activity that make it attractive to participants. 2009 Mt. Laws Ch. 331 (H.B. 150), preamble. The Legislature specifically intended to limit providers' liability and to discourage claims based on damages that result from inherent risks in a sport or activity. *Id.* The Legislature enacted the MRRA to further the State's interest in maintaining the economic viability of Montana's sports and recreational industries. *Id.*

Imposing strict liability would eviscerate the purpose of the MRRA. Instead of limiting recreational provider's liability for inherent risks, it would render them strictly liable for those risks. *See Christian v. Atl. Richfield Co.*, 358 P.3d 131, 150 (Mont. 2015) ("A claim based upon strict liability for the conduct of an abnormally dangerous activity . . . means that the defendant is liable for harm resulting from the activity, even if the defendant acted with reasonable care."). In short, it would accomplish the exact opposite of what the MRRA was intended to do.

Therefore, because Plaintiffs have not shown good cause for their delay in seeking amendment, and because the amendment would be futile, Plaintiffs' Motion to Amend the Complaint is DENIED.

## IV.   CONCLUSION

For the foregoing reasons, the Court **ORDERS** as follows:

(1)     Plaintiffs' Motion to Amend (Doc. 23) is **DENIED**;

(2)     Plaintiffs' Motion for Partial Summary Judgment (Doc. 28) is

**DENIED**; and

(3)     Defendant's Motion for Summary Judgment (Doc. 31) is **GRANTED**

**in part and DENIED in part**.

**IT IS ORDERED**.

DATED this 28th day of September, 2018.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge